C. P. COOK AND ED PLUNKETT, Appellants, v. MARSHALL COUNTY, Appellee.

Interstate Commerce: "ORIGINAL PACKAGES:" CIGARETTES: Where
1    a manufacturer of another state wrapped ten cigarettes in a package and delivered a large number of these packages to an express company to be transported to a retail dealer in this state, to be sold by him in unbroken packages, the same do not constitute such "original packages" as the law contemplates, and the parties so dealing are not entitled to the protection of the interstate commerce clause of the federal constitution.

Statutes: TITLE: UNIFORM OPERATION. Section 5007 of the Code,
2    providing for the assessment of a tax against any person dealing in cigarettes and the real property within or whereon the

same. are sold, and the manner of collecting the same, is suffi- ciently expressed in the title "An act to revise, amend and codify the statutes in relation to crimes and their punishment" and is germane to the general subject of "Crimes and their punishment," in which the same is included.

*Appeal from Marshall District Court.*—HON. G. W. BURN- HAM, Judge.

MONDAY, FEBRUARY 2, 1903.

THE opinion states the case.—*Affirmed.*

*Dunshee & Dorn* (J. Parker of Counsel), for appellants.

*Henry Stone* for appellee.

WEAVER, J.—The appellant Cook is a dealer in tobacco, cigars, and cigarettes, carrying on his business in a build- ing owned by Plunkett, the other appellant, in the city of Marshalltown. A mulct tax having been assessed against Cook under the provisions of section 5007 of the Code, ap- pellants petitioned the board of supervisors to remit and cancel such tax on the ground that no cigarettes had ever been kept, sold, or given away by Cook except in the original packages made by the manufacturer in another state, and in that form shipped directly to him in this state, and that, therefore, the section of the Code referred to as applied to such sales is in violation of the constitu- tion of the United States, which reserves to congress the right and power to regulate interstate commerce. This petition was supported by affidavit of an employe of the shipper at St. Louis, in the state of Missouri, that the cigarettes sold and shipped to Cook were done up in paste- board boxes containing ten cigarettes each (the printed record leaves a blank for the number in each box, but coun- sel for appellants state the number to be ten, and we will so consider it). The affidavit further states that the pack-

ages were separately sealed and stamped with a revenue stamp, and adds that: "These packages were shipped to C. P. Cook absolutely loose, or at least neither the American Tobacco Company nor myself or any one of its other employes for it furnished any box, bale, wrapping, or other covering for these packages, nor in any way attached them together. These packages were not separately addressed, nor were any of them addressed, but at the time they were delivered to the driver of the U. S. Express Co., which express company was the common carrier to whom the delivery was made, the said driver took a duplicate of the receipts he had given. These receipts showed the number of packages and the name of the person to whom they were to be sent, and from its duplicate receipts I suppose the express company had notice of the number to be delivered and the name of the consignee and his address." This petition being refused, an appeal was taken to the district court, where an amendment was filed, alleging that the statute providing for the mulct tax is invalid, because the subject-matter of said section 5007 is not expressed or indicated in the title to the act in which it is found, as provided in the constitution of this state, and because it discriminates in favor of jobbers and wholesalers doing an interstate business. A demurrer to the amended petition, as stating no ground or fact entit ing petitioners to the relief demanded, having been sustained, and judgment entered against them for costs, the petitioners appeal.

I. We first consider whether the petitioners show themselves entitled to the protection afforded by the interstate commerce clause of the federal constitution. It 1. INTERSTATE commerce: original packages: cigaretts. is asserted that the traffic in which Cook was engaged was the receiving and selling of cigarettes in the original packages as shipped from the manufacturer in another state, and is therefore lawful under the rule applied in *Leisy v. Hardin*, 135 U.

S. 100 (10 Sup. Ct. Rep. 681, 34 L. Ed. 128), and other cases of the same general nature, decided by the supreme court of the United States. So far as this branch of the case is concerned the question is whether ten cigarettes, put up, handled, shipped, and sold in the manner indicated by the petition, is such an "original package" as is meant by the authorities which the appellant relies upon. As an original proposition, addressed to common sense, aided by a conscience of average enlightenment, and uncomplicated by-precedent, there would seem to be no room for doubt that this question should be answered in the negative. It must be admitted, however, that authorities are not wanting affording the appellants some ground to believe that any scheme or device, no matter how transparent the fraud, is sufficient to baffle the power of a sovereign state so long as it bears the magic legend "original package." This theory is founded upon what has been supposed to be the holding of the court of last resort in the cases already referred to; but, as we view it, those decisions do not justify the deductions made. The term "original package" is not to be found in the constitution, and has come into use simply as a convenient term or expression for one of the incidents ordinarily inseparable from interstate commerce. The term "imports" or "foreign commerce" or "interstate commerce" always implies the idea of goods, wares, or merchandise manufactured, produced, or prepared in one jurisdiction, and carried into another for the purpose of sale. There can be no such commerce without transportation or carriage. For convenience and safety in such transportation, most articles of commerce being shipped to an importer or buyer are combined into packages, encased in boxes or other wrapping, and directed to the proper consignee. In this form they do not ordinarily enter into the retail or general trade of the community, and the fact that the package is unbroken is an indication that the goods have not yet lost their distinctive character

as imports, or become mingled with the mass of property subject solely to the jurisdiction of local authority.

The recognition of this feature by Chief Justice Marshall in *Brown v. Maryland*, 12 Wheat. 419 (6 L. Ed. 678), is the foundation on which all subsequent "original package" decisions in the various courts of the land are sought to be justified. In this, as in some other notable instances, the principle then announced has been so distorted and wrested from its original simple meaning that, if the great jurist were permitted to return, to the scene of his historic labors, he would doubtless hesitate long before acknowledging the legitimacy of the descent of the modern doctrine. It should not be overlooked that the pronouncement of Chief Justice Marshall upon which such reliance is placed was made in reference to foreign commerce only, and that the words so often quoted were employed in discussing the constitutional prohibition of duties and imposts by state authorities, and did not involve any consideration of interstate commerce. *Woodruff v. Parham*, 8 Wall. 123 (19 L. Ed. 382). This distinction is noted and emphasized in the majority opinion in the late case of *Austin v. Tennessee*, 179 U. S. 343 (21 Sup. Ct. Rep. 132, 45 L. Ed. 224), hereinafter more particularly referred to.

The term "original package," as employed in law, admits of no precise definition applicable to all cases. Generally, it is said to be a parcel, bundle, bale, box, or case made up of or "packed" with some commodity with a view to its safety and convenient handling in transportation. *Keith v. State*, 91 Ala. 2 (8 South. Rep. 353, 10 L. R. A. 430); *State v. Board of Assessors*, 46 La. Ann. 146 (15 South. Rep. 10, 49 Am. St. Rep. 318); *Austin v. State*, 101 Tenn. 563 (48 S. W. Rep. 305, 50 L. R. A. 478, 70 Am. St. Rep. 703); *Com. v. Schollenberger*, 156 Pa. 201 (27 Atl. Rep. 30, 22 L. R. A. 155, 36 Am. St. Rep. 32). It does not necessarily mean that goods shall be inclosed in a tight or sealed receptacle. *McGregor v. Cone*, 104 Iowa, 465;

*State v. Chapman,* 1 S. D. 114 (47 N. W. Rep. 411, 10 L. R. A. 432). It relates wholly to goods as prepared for transportation, and has no necessary reference whatever to the package originally prepared or put up by the manufacturer. Indeed, the idea of an original package may well be made to cover certain forms of property which do not ordinarily admit of being "packed" or encased in any other manner than in the car or vessel in which they are transported. Such, for instance, as steel beams, threshing machines, and other bulky articles. Whether, in such cases, the unit or package for the purposes of interstate commerce is the car load, or cargo, or the entire consignment, or the individual articles of which the consignment is composed, is unnecessary for us to consider. Fortunately, as regards the very class of goods now in controversy, we are not left without a controlling precedent.

*Austin v. Tennessee, supra,* recently decided by the supreme court of the United States, upholds the constitutionality of a statute of Tennessee prohibiting the sale of cigarettes in that state. There, as here, the nonresident manufacturer and the resident agent or dealer, aided by a superserviceable common carrier, undertook to convert the interstate commerce privilege afforded by the federal constitution into a shield behind which to violate the law of the state with impunity. The plan adopted may be explained as follows: To conform to the internal revenue law of the United States, the manufacturer put the cigarettes into small pasteboard boxes of ten each. These boxes are about three inches in length, and one and one-half inches in width, a convenient size for the vest pocket of the schoolboy or man addicted to the use of tobacco in that form. In filling an order for these goods from a state where the traffic was unlawful, the seller instead of packing the requisite dozens or hundreds or thousands of boxes in a larger box or package, as would be done in legitimate commercial

transactions generally, placed the small boxes in a loose pile upon the floor of his warehouse, and notified the carrier, who came, gathered up the consignment in a basket, and put it in course of transportation to the consignee. By this device it was claimed that each box of ten cigarettes was to be considered an original package, which the importer might lawfully receive, hold, and sell without let or hindrance by the state authorities. The adoption of this doctrine would, of course, prove absolutely destructive of the right of the state to place any ban whatever upon the sale of this class of goods. The cause of good government and good morals is to be congratulated, however, upon the fact that a majority of the court refused to allow the last vestige of the police power of the state for the protection of its people to be thus obliterated. The opinion says: "The real question in this case is whether the size of the package in which the importation is actually made is to govern *or the size of the package in which bona fide transactions are carried on between the manufacturer and the wholesale dealer residing in different states.* We hold to the latter view."

The words we have italicized appear to afford the only proper or efficient test of this troublesome question as to what is an original package for the purposes of interstate commerce. Even this definition is capable of being abused at times to the detriment of the interests of the states, but in a much smaller degree than any other yet attempted. The further discussion by the court is so lucid and convincing in statement, and so applicable to the case at bar, we further quote: "The whole theory of the exemption of the original package from the operation of state laws is based upon the idea that the property is imported in the ordinary form in which from time immemorial foreign goods have been brought into the country. These have gone at once into the hands of the wholesale dealers, who have been in the habit of breaking the packages and

distributing their contents among the several retail dealers throughout the state.    It was with reference to this method of doing business that the doctrine of the exemption of the original package grew up.    But taking the words 'original package' in their literal sense, a number of so-called 'original package' manufactories have been started through the country, whose business it is to manufacture goods for the express purpose of sending their products into other states in minute packages, that they may at once go into the hands of the retail dealers and consumers, and thus bid defiance to the laws of the state against their importation and sale.    In all the cases which have heretofore arisen in this court the packages were of such size as to exclude the idea that they were to go directly into the hands of the consumer, or be used to evade the police regulations of the state with regard to the particular article.    No doubt the fact that cigarettes are actually imported in a certain package is strong evidence that they are original packages within the meaning of the law, but this presumption attaches only when the importation is made in the usual manner prevalent among honest dealers, and in a *bona fide* package of a particular size.    Without undertaking to determine what is the proper size of an original package in each case, evidently the doctrine has no application where the manufacturer puts up the package with the express intent of evading the laws of another state, and is enabled to carry out his purpose by the facile agency of an express company and the connivance of his consignee.    This court has repeatedly held that, so far from lending its authority to frauds upon the sanitary laws of the several states, we are bound to respect such laws, and to aid in their enforcement, so far as can be done without infringing upon the constitutional rights of the parties. The consequences of our adoption of defendant's contention would be far-reaching and disastrous.    For the purpose of aiding a manufacturer in evading the laws of a

sister state, we should be compelled to recognize anything as an original package of beer from a hogshead to a vial; anything as a package of cigarettes from an importer's case to a single paper box of ten, or even a single cigarette, if imported separately and loosely; anything from a bale of merchandise to a single ribbon, provided only the dealer sees fit to purchase his stock outside of the state, and import it in minute quantities.   There could hardly be stronger evidence of fraud than is shown by the facts of this case.   *   *   *   Now, the result of defendant's argument in this case is that citizens of Tennessee may, under the commerce clause of the constitution of the United States, bring into that state from other states cigarettes in unlimited quantities, and sell them despite the will of Tennessee as expressed in its legislation.   In other words, it is decided that the commerce clause of the constitution, by its own force, without any legislation by congress, overrides the action of the state in a matter confessedly involving, in the judgment of its legislature, the health of its people.   We cannot accept this view.   The doctrine that the silence of congress as to what property may be of right carried from one state to another means that every article of commerce may be carried into one state from another, and there sold, ought not to be extended so as to embrace articles which may not unreasonably be deemed injurious in their use to the health of the people.   If this be not so, it follows that the reserve power of the state to protect the health of its people by a reasonable regulation has application only in respect of articles manufactured within its own limits, and that an open door exists for the introduction into the state against its will of all kinds of property which may be fairly regarded as injurious in their use to health."

To the usual effort to bring this kind of traffic within the principle of *Brown v. Maryland*, the court quotes the language of Chief Justice Marshall, and adds:   "This

sentence contains in a nutshell the whole doctrine upon the subject of original packages upon which so formidable a structure has been attempted to be erected in subsequent cases.    Whether the decision would have been the same if the original packages in that case, instead of being bales of dry goods, or hogsheads, barrels, or tierces of liquor, had been so minute in size as to permit their sale directly to consumers, may admit of considerable doubt. Obviously, the doctrine of the case is directly applicable only to those large packages in which from time immemorial it has been customary to import goods from foreign countries.    It is safe to assume it did not occur to the chief justice that by a skillful alteration of the size of the packages the decision might be used to force upon a reluctant people the use of articles denounced as noxious by the legislatures of the several states."

The scheme by which the tobacco company attempts to circumvent the laws of the state is appropriately denounced in the opinion as "a discreditable subterfuge, to which this court ought not to lend its countenance."    The only point upon which counsel attempts to distinguish between the *Austin Case* and the case at bar is in the fact that in the former it appears affirmatively that the express company made use of a basket in removing the loose pile of small pasteboard boxes from the floor of the company's warehouse, while in the latter no mention is made of the basket.    The petition and affidavit, which constitutes the showing here made, are drawn with much carefulness and skill to make it clear that "neither the American Tobacco Company nor any of its employes furnished any box, bale, bag, wrapping, or any covering for these packages, nor in any way attached them together," and that in this condition, without any mark or address upon them, they were delivered to the express company.

The care and precision with which we are told what the tobacco company did not do in making the shipment is

no less conspicuous than the omission to tell what its agent, the express company, did do in that regard. We think, however, it indicates no such material variance in the facts of the two cases as to affect the application of the rule. Conceding that the tobacco company scrupulously refrained from doing more than counting and pointing out the loose packages to the express company with directions to carry the same to the buyer in Marshalltown, yet we know, as a matter of common observation and immemorial usage, that this is not the manner "in which *bona fide* transactions are carried on between the manufacturer and wholesale dealer residing in different states," and is, therefore, not entitled to claim the exemptions attaching to interstate commerce. Still further we may rightfully a sume that the express company, in receiving and shipping these little boxes, did it in a rational manner, not by handling or carrying the boxes as ants carry sand, one grain at a time, but by gathering them, if not in baskets, in receptacles of some suitable and convenient kind; and in such case, under the doctrine of *McGregor v. Cone, supra,* the receptacle so used would be the original package, if, indeed, there be anything in the transaction entitled to that appellation. The extreme and unreasonable extension of the principle affirmed in *Brown v. Maryland* has been the fruitful source of much annoyance and embarrassment in many of the states of the Union. And it is a striking, but just, commentary upon the perversion of the principle embodied in that decision, to note that practically the only beneficiaries of the modern doctrine of the sanctity of original packages in interstate commerce are the whisky seller, the cigarette manufacturer, and the dealer in bogus butter,—a trinity which finds it profitable to force its wares upon states whose people, speaking through their constituted authorities, seek to exclude them as injurious to public health and morals.

The demoralization thus resulting upon a denial of the right of the state to protect the lives, health, and morals of its people is not overstated by Williams J., in *Com. v. Schollenberger, supra*, decided by the supreme court of Pennsylvania. Speaking of the claim there made that certain sales of oleomargarine in violation of a local statute were privileged, as being interstate commerce, he says: "Law-abiding citizens will not embark in a business which is forbidden by the laws of the state in which they live. Timid men are afraid to do so. This kind of operation is left, therefore, to those who have no respect for law, no interest in the public welfare, and no fear of public opinion. When such men deliberately determine to put money in their pockets by engaging in a business which the state has declared to be injurious to the public morals, the public health, or the public peace, and has, therefore, forbidden altogether, or placed under strict police regulations, they are morally certain to seek immunity for themselves and their unlawful business by immediate flight to the sanctuary of the national constitution, and there laying hold on the horns of the altar of interstate commerce. The road to this refuge of lawbreakers is well beaten There are signboards at every crossing on the route, and the intermediate stations for profitable rest wear conspicuous signs of invitation. The travelers over it are generally foreigners to the state whose laws they trample upon, and include a motley assortment of traders. Beginning with the peripatetic swindlers whose worthless wares are transported in tin trunks, which they carry in their hands, and who hunt their victims in secluded villages and along the country roads, with an instinct that rarely fails, and running up or down the scale of lawbreakers to the men whose commercial operations extend to the sale of oleomargarine by the pound, and of intoxicating drinks by the pint, there is no man in the procession who is not a conscious and deliberate lawbreaker, and who does not set his possible

profits from a forbidden business above his duty to society or the state that protects him. These men seek to pervert a rule of law that has a wide and beneficial field of operation. They claim to be engaged in interstate commerce, and to be entitled to the protection of the general government, and against the police laws of the individual states, for that reason. * * * The mischief done and attempted in this manner under the guise of interstate commerce is so great, so open, and so difficult to suppress or punish that in many states besides this it has become a matter of general and sincere regret that the interstate commerce law was ever held applicable to the trade in any article recognized throughout the civilized world as a proper subject for police regulation and control."

The decision of the supreme court of the United States which reversed the holding of the state court in these oleomargarine cases—*Schollenberger v. Pennsylvania*, 171 U. S. 1 (18 Sup. Ct. Rep. 757, 43 L. Ed. 49)—turns principally upon the effect of a special verdict of the jury, and serves neither to dull nor turn aside the point of the quotation we have made. The duty of the courts to apply every available and legitimate remedy for the evils thus graphically set forth is plain. The case made by the appellants to bring their business within the privileges of interstate commerce is wholly without merit, and the holding of the trial court in res)ect thereto is clearly correct.

II. It is urged by appellants with much earnestness that the statute under which the disputed tax was levied is void, because it does not conform to section 29 of article 3 of the

2. STATUTES: title: uniform operation.

constitution of this state. The provision to which reference is made reads as follows: "Every act shall embrace but one subject and matters properly connected therewith which subject shall be expressed in the title." Section 5007 of the Code, to which objection is here raised, is found in title 24, "Of Crimes and their Punishment," and subtitle (chapter) 11 "Of Offenses

against Public Policy." The general title of the bill as it passed the legislature is "An act to revise, amend and codify the statutes in relation to crimes and their punishment." Section 5006 in chapter 11 prohibits the keeping for sale and the selling and giving away of cigarettes under a penalty of fine and imprisonment. Section 5007 provides that "there shall be assessed a tax of $300 per annum against every person, partnership or corporation and upon the real property within or whereon any cigarettes * * * are sold or given away or kept with intent to be sold or bartered or given away under any pretext whatever." The tax is to be assessed and collected after the manner of the mulct liquor tax, but is not a bar to a prosecution for the penalties provided in section 5006. Both sections exempt from their provisions "jobbers and wholesalers doing an interstate business with persons outside of the state." The question arises whether section 5007 comes fairly within the scope of the title. The end sought to be obtained by the constitutional provision invoked by the appellants "was to prevent the union in the same act of incongruous matters and of objects having no connection, no relation." And with this it was designed to prevent surprise in legislation by having matters of one nature embraced in a bill whose title expressed another. State v. Davis Co. Judge, 2 Iowa, 281. This, it has often been held, does not require a construction forbidding the inclusion in one act of all matters germane to the main proposition or purpose sought to be effected, even though they are not specifically mentioned in the title. If there is a "unity of object" in the various provisions, and that general object is indicated by the title, then, no matter how multifarious the provisions of the act, it sufficiently complies with the constitution. Santo v. State, 2 Iowa, 208; Morford v. Unger, 8 Iowa, 85; Porter v. Thompson, 22 Iowa, 391.

In this connection we may well note the development of this provision in our constitution, and the language in

which it is framed. In the constitution of 1846 it appears in these words (article 3): "Sec. 26. Every law shall embrace but one object, which shall be expressed in the title." Seemingly to avoid the embarrassments which might arise from a narrow construction of the rule as thus expressed, the framers of the present constitution changed it to read: "Every act shall embrace but one subject *and matters properly connected therewith,* which subject shall be expressed in the title." The added words which we have italicized are highly important, and clearly indicate the intention that the rule shall be liberally interpreted. It is the general policy of every state in the Union to collect and restate from time to time the whole body of its statute law in a complete and systematic form or code, and we think it has never been held by any court that this assembling under one head of various enactments tending to the same general object is not valid under the constitution. Any other conclusion would render valueless all efforts at codification. In *Johnson v. Harrison,* 47 Minn. 575 (50 N. W. Rep. 923, 28 Am. St. Rep. 382), we find the following clear and forceful discussion of the principle: "Any construction of this provision of the constitution that would interfere with the very commendable policy of incorporating the entire statutory law, upon one general subject in a single act, instead of dividing it into a number of separate acts, would not only be contrary to its spirit, but also seriously embarrassing to honest legislation. All that is required is that the act should not include legislation so incongruous that is could not by any fair intendment be considered germane to the general subject. The subject may be as comprehensive as the legislature chooses to make it, provided it constitutes, in the constitutional sense, a single subject, and not several. The connection or relationship of several matters such as will render them germane to one subject and to each other can be of various kinds; as, for example,

of means to ends, of different subdivisions of the same subject, or that all are designed for the same purpose, or that both are designated by the same term.    Neither is it necessary that the connection or relationship should. be logical.    It is enough that the matters are connected with and related to a single subject in popular  signification. *  *  *   Neither is the fact important that a law contains matters which might be and usually are contained in separate acts, or would be more logically classified as belonging to different subjects, provided only they are germane to the general subject of the act in which they are put. The legislature is not limited to the most logical or philosophical classification.''    Another court has said:  ''It is not intended to prohibit the uniting in one bill of any number of provisions having one general object fairly indicated by its title.    The unity of the object must be sought in the end which the legislative act purposes to accomplish.'' *Walter v. Town of Union*, 33 N. J. Law, 351; *Montclair Tp. v. Ramsdell*, 107 U. S. 147 (2 Sup. Ct. Rep. 391, 27 L. Ed. 431).  ''The constitution is obeyed if all the provisions relate to the one subject indicated in the title, and parts of it, or incident to it, or reasonably connected with it, or in some sense auxiliary to the object in view.'' *Ritchie v. People*, 155 Ill. 98 (40 N. E. Rep. 454, 29 L. R. A. 79, 46 Am. St. Rep. 315); *Bobel v. People*, 173 Ill. 19 (50 N. E. Rep. 322, 64 Am. St. Rep. 64).    It is admissible to include in a statute ''means which are reasonably adapted to secure the objects indicated by the title.''    *Cohn v. People*, 149 Ill. 486 (37 N. E. Rep. 60, 23 L. R. A. 821, 41 Am. St. Rep. 304).    To the same general effect, see Cooley, Constitutional Limitations (4th Ed.) 175-178; *Lacey v. Palmer*, 93 Va. 159 (24 S. E. Rep. 930, 31 L. R. A. 822, 57 Am. St. Rep. 795); *Ewing v. Hoblitzelle*, 85 Mo. 64; *Grover v. Trustees*, 45 N. J. Law, 401; *State v. Silver*, 9 Nev. 231; *Fahey v. State*, 27 Tex. App. 146 (11 S. W. Rep. 108, 11 Am. St. Rep. 182); *Van Brunt v. Town of Flatbush,*

128 N. Y. 50 (27 N. E. Rep. 973); *State v. Mines*, 38 W. Va. 137 (18 S. E. Rep. 470).

Accepting the foregoing as announcing the correct rule of interpretation, we have next to inquire if the so-called "mulct tax" is in any sense germane to the general purpose of the act in which it is found. Bear in mind that this statute as a whole is an attempt to restate not only the law defining crimes and misdemeanors, but the remedies to be applied for suppressing and punishing the same. It certainly was competent for the legislature under this head to designate those acts which, in its wisdom, should be forbidden as against public policy, and to include therein the traffic in cigarettes. The authorities to this effect are too numerous and familiar to require citation. In codifying these statutes the legislature found already upon the statute book the prohibition now carried into section 5006 (see Laws 26th General Assembly, chapter 96), and in carrying it into the Code amended it by adding thereto section 5007, providing for the mulct. That it was intended as an aid in suppressing and punishing vi lations of the provisions of the preceding section seems too clear for controversy. While called a "tax," it is a "mulct" tax, and a mulct is "a fine imposed for an offense, a penalty." See "Mulct," Anderson, Law Dictionary, Ebersole, Law Dictionary, Century Dictionary. It is not even a form of license by indirection, for it contains no "bar clause," but, on the contrary, expressly provides that it may be exacted in addition to the penalties name l in section 5006. The end sought by both these sections is identical,—the suppression and prevention of the traffic in cigarettes. To use the language of the authorities to which we have referred, there is here a "unity of object," and the mulct is manifestly an auxiliary to the end sought to be accomplished. It is not wholly unlike those familiar enactments which provide for the punishment of a crime or misdemeanor, and unite them with provision for

assessing further penalty or damages in a civil proceeding. For instance, section 4822 of the Code authorizes punishment for malicious trespass, and, in addition thereto, authorizes the owner to recover three times the amount of his actual damage from the trespasser in a civil proceeding. Section 4834 prescribes the penalty for larceny of logs and timber floating in the rivers of the state, and is followed by section 4835, which subjects any person thus offending, whether convicted thereof in a criminal proceeding or not, to pay the owner of the stolen property twice the value thereof.   If section 4835 can properly be held germane to the general purpose indicated in section 4834 (and we think none will dispute it), we see no good reason for applying any different rule to the sections to be construed in the case before us.   Other instances of like legislation will readily suggest themselves in which a "tax" or "mulct" or "penalty" is provided as an additional weapon in the hands of the state for enforcing obedience to its commands. It must be remembered that title 24 of the Code is no more than what it purports to be, —"an act to revise, amend and codify" statutes already existing.   Those statutes, we must assume, were properly entitled; at least, no objection is raised thereto by appellants.   Such being the case if the title to the original act or acts is sufficient to embrace the matters covered by the provisions of the act amendatory thereof (and, as we have said, no objection of that nature is here raised), it is unnecessary to inquire whether the title to the amendatory act would of itself be sufficient.   *Morford v. Unger*, 8 Iowa, 85; *Brandon v. S ate*, 16 Ind. 197; *Improvement Co. v. Arnold*, 46 Wis. 214 (49 N. W. Rep. 971); *State v. Ranson*, 73 Mo. 78; *State v. Algood*, 87 Tenn. 163 (10 S. W. Rep. 310); *Com. v. Brown*, 91 Va. 762 (21 S. E. Rep. 357, 28 L. R. A. 110); *People v. Parvin*, (Cal.) 14 Pac. Rep. 783; *Lankford v. Com'rs*, 73 Md. 105 (20 Atl. Rep. 1017, 11 L. R. A. 491).

It may be that in a matter of original legislation a proper observance of the constitution would require the separation into se. arate acts of matters which we hold it proper to combine in a single general measure of amendment, revision, or codification.    But that phase of the question is not now before us, and we need not consider it. It is not improper, however, to observe that by the adoption of the Code of 1897 the entire body of the statutory law of this state, consisting of many hundred separate acts, was classified and combined under twenty-six titles.    Each of these titles of necessity contains widely variant provisions, but all having more or less appropriate relation to the general topic to which such title is devoted.    To adopt the strict doctrine for which appellants contend would unsettle the validity of a multitude of Code provisions, and open the door to legal chaos.    True, even such an unfortunate result should not deter the court from accepting and announcing a rule which is clearly right, but it is a good and sufficient reason why we should pause and refuse to take a position attended with such grave consequences until its propriety and correctness are demonstrated beyond reasonable doubt.    Moreover, it is a well-established principle, which this court h is often applied, that it is the duty of the courts to give such a construction to an act, if possible, as will avoid the necessity of holding it void for unconstitutionality.   *State v. Davis Co. Judge,* 2 Iowa, 282.    It is a power which will not be resorted to unless the case be clear, decisive, and unavoidable. *Santo v. State, supra.*  A late case decided by the supreme court of California— *Lewis v. Dunne,* 134 Cal., 291 (66 Pac. Rep. 478 55 L. R. A. 833, 86 Am. St. Rep. 257)—holds that an act embodying numerous amendments to different sections of the Code, and repealing others is unconstitutional, but the validity of acts of general revision and codification under general and comprehensive titles is supported by the great weight of authorities.   *Central of Georgia Ry. Co. v. State,*

104 Ga. 831 (31 S. E. Rep. 531, 42 L. R. A. 518); *Mathis v. State*, 31 Fla. 291 (12 South. Rep. 681); *McLane v. Paschal*, 8 Tex. Civ. App. 398 (28 S. W. Rep. 711); *Larned v. Tiernan*, 110 Ill. 173; *Marston v. Humes*, 3 Wash. St. 267 (28 Pac. Rep. 520); *City of Hannibal 'v. Marion Co.*, 69 Mo. 571. See, also, the very exhaustive briefs of counsel and note to *Lewis v. Dunne*, 134 Cal, 291 (55 L. R. A. 833 (s. c. 66 Pac. Rep. 478, 86 Am. St. Rep. 257), where the cases upon both sides are collated.

III. The further contention that the statute is unconstitutional because it is not uniform in its operation, and exempts certain persons from its observance, cannot be sustained. The reference made in the statute to jobbers and wholesale dealers doing business with customers outside of the state does not bear the construction which counsel put upon it. The evident purpose of the proviso is to avoid any interference with shipments made from such dealers in the state to points outside of the state, and thus escape, if possible, any objection to its validity based upon the exclusive control of congress over interstate commerce. Whether it is effective for the purpose intended we need not consider, and the wisdom of its enactment is a question for the legislature alone. It operates alike upon all persons in like situation, and therefore is of uniform operation within the meaning of the constitution. *Land Co. v. Soper*, 39 Iowa, 112; *Association v. Schrader*, 87 Iowa, 659; *Christie v. Investment Co.*, 82 Iowa, 360.

The judgment of the district court is AFFIRMED.