UNITED STATES v. SIXTY–FIVE CASKS LIQUID EXTRACTS.

(District Court, N. D. West Virginia.   May 25, 1909.)

1. DRUGGISTS (§ 2*)—FOOD AND DRUGS ACT—CONSTRUCTION AND SCOPE.
     Food & Drugs Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1907, p. 928), not only requires that drugs shipped in interstate commerce and labeled shall not be misbranded, but also requires that they shall be labeled with labels conforming to its requirements.
     [Ed. Note.—For other cases, see Druggists, Dec. Dig. § 2.*]

2. DRUGGISTS (§ 11*)—FOOD AND DRUGS ACT—PROCEDURE FOR FORFEITURE OF MISBRANDED ARTICLE—CONDITIONS PRECEDENT.
     Under Food & Drugs Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1907, p. 928), the preliminary examination of an article within its provisions by the Department of Agriculture, and notice to the party from whom the sample is obtained of its adulteration or misbranding, as provided for in section 4, are not conditions precedent to a libel in rem for the forfeiture of articles seized for adulteration or misbranding under section 10.
     [Ed. Note.—For other cases, see Druggists, Dec. Dig. § 11.*]

3. COMMERCE (§ 41*)—FOOD AND DRUGS ACT—FORFEITURE FOR MISBRANDING— "ORIGINAL PACKAGE."
     Where a liquid in casks is shipped in interstate commerce in car load lots, the cask and not the car is the "original package" within the meaning of Food & Drugs Act June 30, 1906, c. 3915, § 10, 34 Stat. 771 (U. S. Comp. St. Supp. 1907, p. 934), which authorizes the seizure and forfeiture for adulteration or misbranding of articles so shipped while remaining in "original unbroken packages." [Citing Words and Phrases, vol. 6, p. 5059.]
     [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 41.*]

4. COMMERCE (§ 41*)—FOOD AND DRUGS ACT—SCOPE—SHIPMENTS IN INTERSTATE COMMERCE.
     Claimant was the owner of a secret formula for a proprietary drug preparation, and conducted its business at Wheeling, W. Va., from which place it sold and shipped its preparation in bottles properly labeled. It had the preparation made, however, at Detroit, Mich., from which point it was shipped to claimant in casks by car lots, and, when received, was bottled and labeled by claimant in Wheeling before being offered for sale. *Held*, that such shipments were not made in interstate commerce, but only from the manufacturing agents to the owner, and the casks after their receipt by claimant were not subject to seizure and forfeiture because not labeled under section 10, Food & Drugs Act June 30, 1906, c. 3915, 34 Stat. 771 (U. S. Comp. St. Supp. 1907, p. 934).
     [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 41.*]

5. DRUGGISTS (§ 2*)—FOOD AND DRUGS ACT—"LABEL."

The word "label" as used in Food & Drugs Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1907, p. 928), which requires packages of drugs shipped in interstate commerce to bear a statement on the label of the quantity or proportion of any alcohol, etc., means a descriptive paper affixed to the package, which must include the statement of how much alcohol, etc., is contained in the package.

[Ed. Note.—For other cases, see Druggists, Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 5, pp. 3947, 3948.]

This libel proceeding seeks to confiscate 65 casks of liquid extracts under and by virtue of section 10, Act Cong. June 30, 1906, c. 3915, 34 Stat. 771 (U. S. Comp. St. Supp. 1907, p. 934), known as the "Food and Drugs Act." The Knowlton Danderine Company has intervened as the owner and resists the confiscation. The facts have been agreed, trial by jury has been waived, and all matters in controversy submitted to the court. The facts so agreed are as follows:

The said Knowlton Danderine Company is a corporation organized under the laws of the state of Illinois, having a warehouse, laboratory, and finishing department in Wheeling, in the state of West Virginia, and is the proprietor of a preparation for the hair which it markets in three-ounce, six-ounce, and twelve-ounce bottles under the trade name of "Danderine," the formula of which is a trade secret and comprises liquid extracts and other ingredients. Parke, Davis & Co., who are mentioned in the said libel as shippers, are manufacturing pharmacists at Detroit, in the state of Michigan, and are under contract with the said Knowlton Danderine Company, the respondent in this proceeding, to compound the said formula and to cause the same to be transported and delivered in bulk in car load lots to the respondent at Wheeling, and no sale of the said danderine is made to the public or any outside purchasers until the said casks are emptied and the contents thereof placed in the properly marked bottles. The said casks are made of wood bound with iron hoops, and shipped like barrels, and for the purposes of safe transportation a sufficient number of casks, each holding about 50 gallons, are used, which, when emptied by the respondent, are returned to the said Parke, Davis & Co. to be again refilled and shipped. Each and every one of the 65 casks mentioned in said libel contained a drug product accurately compounded in accordance with said formula, and said drug product contained an average of 10 per centum of alcohol. All of the said casks are marked in the same manner, with the exception that the figures, some of which show the number of gallons contained therein and others the number of casks, are marked in the same manner when shipped, and are marked wholly upon one end of the cask. Varying as to figures as aforesaid, each cask is marked as follows:

49½

S 46022

#63

Wheeling Terminal,

19th St. Delivery

Knowlton Danderine Company,

Wheeling, W. Va.

505 lbs.

There are no other marks, brands, or labels upon the said casks or any of them, and the casks which are referred to in the said libel were marked in the manner hereinbefore indicated, and had no other marks, brands, or labels upon them. When the contents are removed from the said casks they are

placed in bottles, and on each bottle is a printed label containing in plain letters the words "Danderine Scalp Tonic, Alcohol 10 per cent."

The said respondent has a spur track running into its building at Wheeling, upon which each car is left as soon after its arrival as possible, and the casks are removed from the car promptly by the respondent, which bottles and labels the contents, which process of bottling and labeling is known as the finishing process, and in pursuance of this custom the respondent had before the seizure of the casks, which was made in this proceeding, emptied 59 of the said 65 casks, and was engaged in bottling and labeling the same, and would have continued so doing until all of the 65 casks were bottled and labeled but for the seizure in this proceeding of the 6 casks which had, not been emptied or bottled, though the last-mentioned 6 casks had been removed from the car in which they had been shipped and received.

The 65 casks mentioned in the said libel were shipped by Parke, Davis & Co. to the respondent by boat to Sandusky, in the state of Ohio, where they were transferred to a car which contained nothing else, and the said last-mentioned car was forthwith transferred from Sandusky, in the state of Ohio, to Wheeling, in the state of West Virginia, and was delivered upon the premises and in the building of the respondent, and was emptied at the time of the seizure of the said 6 casks.

The libel filed in this proceeding is based upon an examination of the samples of the contents of the said casks obtained from the respondent a few days prior to the filing of the said libel by a food and drugs inspector from the Department of Agriculture of the United States. The Secretary of Agriculture did not cause notice to the effect that it appeared from such examination of the said sample that the same was adulterated or misbranded to be given to the respondent as the owner and claimant thereof, or to any one else, before the matter was directed to the attention of the District Attorney, or before this proceeding was begun and the casks seized by the marshal.

After the United States marshal had seized 6 of the 65 casks of liquid extracts mentioned in the said libel, he permitted a food and drugs inspector of the Department of Agriculture to open one or more of the said casks of liquid extracts and to transfer and remove therefrom about 3 gallons of the contents thereof.

The situation and conditions as shown by the facts herein set forth were substantially the same from the time when the 65 casks involved in this proceeding were originally shipped from Detroit down to and including the present time.

Reese Blizzard, U. S. Atty., and E. M. Showalter, Asst. U. S. Atty.

Charles M. Woodruff, Henry M. Campbell, and Henry M. Russell, for intervener, Knowlton Danderine Co.

DAYTON, District Judge (after stating the facts as above). The defenses relied on are: (a) That the food and drugs act (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1907, p. 928]) does not require a drug product to be labeled, nor, if unlabeled, to bear any statement respecting the amount of alcohol contained, but, if labeled, the label must contain the statement. The casks in controversy were not labeled, therefore not subject to the provisions of the act. (b) The libel is predicated upon an examination of specimens under section 4 of the act; but the Secretary of Agriculture did not cause any notice to be given to the party from whom the samples were obtained, nor afford such party any opportunity to be heard. (c) The goods seized were, at the time of seizure, no longer in the "package" or condition in which the importer received them, but had become merged with the property of the state, and were therefore not under the operation of the interstate commerce clause of the Constitution or of any law sub-

sisting by virtue of such clause. The "original package" in this case was the car which was delivered upon the premises and into the possession of the defendant, and which had been entirely emptied of its contents before seizure of the 6 casks taken upon the warrant issued in this case. (d) Seizure of 6 casks upon a warrant for 65 casks was not authorized or legal. (e) In no event is a food or drug product subject to libel proceedings under section 10 of this act unless it is being or has been transported into another state for the purpose of sale. In this case the product seized was transported in bulk for the distinct purpose of being "finished," or, to use a nontechnical term, of being bottled and labeled; and it is admitted that, when ready for sale, the salable package bore a label containing a lawful statement respecting content of alcohol.

In support of the first ground of defense, it is contended that "the courts of the United States in determining what constitutes an offense against the United States must resort to the statutes of the United States enacted in pursuance of the Constitution." In re Kollock, 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813. That "regulations prescribed by the President and by the heads of the departments, under authority granted by Congress, may be regulations prescribed by law, so as lawfully to support acts done under them and in accordance with them, and may thus have, in a proper sense, the force of law; but it does not follow that a thing required by them is a thing so required by law as to make the neglect to do the thing a criminal offense in a citizen, where the statute does not distinctly make the neglect in question a criminal offense." U. S. v. Eaton, 144 U. S. 688, 12 Sup. Ct. 767, 36 L. Ed. 591. And that, therefore, this court, in construing this statute, cannot be influenced by any departmental rules or regulations prescribed for its enforcement, but can look alone to the terms of the statute, penal in character, to ascertain whether or not the owner of these casks of liquid can be held either liable to criminal prosecution or to confiscation of its property. In construing the terms of the statute, it is further insisted that a criminal offense cannot be created by implication, but only by direct and positive terms. Granting at once these several propositions to be sound, the crucial question is, does the food and drugs act in express terms require drug products to be labeled? The argument of counsel, that Congress intended by this act, not to correct the evil of failing to label, but of falsely and fraudulently labeling, and therefore drug products, even when put up in packages suitable for retailing, but which bear no labels, are not within the misbranding provisions of the act, is ingenious but untenable, and wholly refuted by the express terms of the act. The first section of it makes it "unlawful for any person to manufacture within any territory or the District of Columbia any article of food or drug which is adulterated or misbranded" within the meaning of the act. This is an unqualified prohibition against the manufacture itself, so far as the Congress had the power to prohibit; that is, in these parts of the country over which it had full control and jurisdiction. Section 2 provides that:

"The introduction into any state or territory or the District of Columbia from any other state or territory or the District of Columbia or from any

foreign country, or shipment to any foreign country, of any article of food or drugs which is adulterated or misbranded, within the meaning of this act, is hereby prohibited."

Here was the exercise, to the fullest limit, by Congress of its power, under the interstate commerce clause of the Constitution, to prevent adulterated and misbranded food and drug products from being placed upon the markets and sold as pure and genuine ones in the several states by expressly banishing them from lawful interstate commerce. In view of these express provisions, I cannot hold with counsel that the evil intended by Congress to be met was simply the false and deceptive branding of drug products and not the sale thereof. The question therefore, recurs to whether this act in such direct terms requires the labeling of drug products offered for sale in the original package as to subject one failing to do so to a criminal prosecution or to confiscation of the property. The two sections from which I have quoted expressly provide for criminal prosecution and penalties for their violation. Sections 6, 7, and 8 of this act define the terms "drug" and "food" as used; what articles of each shall be deemed adulterated, and what articles of each shall be deemed misbranded. It is provided that:

"The term 'misbranded' as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular."

And further, "if the package fail to bear a statement on the label of the quantity or proportion of any alcohol," and other specified substances contained therein. Counsel insist that these provisions do not directly require a label, and that in order to warrant prosecution the provision should have been in effect:

"For the purposes of this act an article shall also be deemed to be misbranded: In case of drugs * * * if the package or other container thereof fail to bear a label."

I think this is too techincal, even under the strict rules governing the construction of criminal statutes. Suppose the provision had read "if the package fail to bear a statement on a label of the quantity of alcohol," etc., would it not as well meet the view of counsel? A label is defined by Webster to be "a slip of paper, parchment, &c., affixed to anything, and indicating the contents, ownership, destination," etc. The use of the word itself, therefore, carries the meaning that it is a descriptive paper affixed to the package, and in express terms the act requires the descriptive matter borne by the paper to include the statement of how much alcohol, etc.. is contained in the package. It does not seem to me that the ruling in the case of United States v. Twenty Boxes of Corn Whisky, 133 Fed. 910, 67 C. C. A. 214, can be made at all applicable here. There an entirely different character of statute was being construed. It did not attempt to bar from interstate commerce the article unbranded, but only to bar the shipment, "under any other than the proper name or brand known to the trade," of spirituous or fermented liquors or wines. This statute was unquestionably passed to prevent fraud upon the revenue, and not as a regulation of

interstate commerce. It follows that the first ground of defense must be unavailing.

The second, to the effect that the Secretary of Agriculture did not cause notice to be given the owner and allow hearing before seizure, has been directly decided in United States v. Fifty Barrels of Whisky (D. C.) 165 Fed. 966, where Judge Morris, in overruling an exception to the libel based on this ground, says:

"Such seizures are not unusual, and it is plain that, if the harshness were conceded, it would not justify the court in reading into the law a limitation which it does not contain. The act provides two different proceedings to enforce its provisions. One is by criminal proceeding in personam; the other is by a proceeding in rem, by seizure of the offending thing itself, and forfeiture if found to be violative of the law. In this latter case there is no provision for a preliminary examination."

With this construction of the statute I am in entire accord, and defense on this ground must be overruled.

Nor do I think sound the third ground of defense, to the effect that in this case the car arriving at Wheeling and shunted into the private side track of respondent was the "original package" and not the several casks in which the liquid was contained. The term "original package," as employed by law, admits of no precise definition applicable to all. Generally, it is said to be a parcel, bundle, bale, box, or case made up of or "packed" with some commodity with a view to its safety and convenient handling and transportation. It does not necessarily mean that goods shall be inclosed in a tight or sealed receptacle. It relates wholly to goods as prepared for transportation, and has no necessary reference whatever to the package originally prepared or put up by the manufacturer. Indeed, the idea of the "original package" may well be made to cover certain forms of property which do not ordinarily admit of being packed or incased in any other manner than in the car or vessel in which they are transported, such, for instance, as steel beams, threshing machines, and other bulky articles. Cook v. Marshall County, 119 Iowa, 384, 93 N. W. 372, 373, 104 Am. St. Rep. 283. This definition has been quoted as being the most favorable I have found to the contention of respondent in this case. Many others have been carefully collated in 6 Words & Phrases, 5059, and the term has been fully discussed in Austin v. Tennessee, 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224. Without prolonging discussion, it seems to me clear that in this case the cask is the "original package," for the very simple reason that the car was wholly incompetent to "package" the liquid itself; the cask was a complete entity of itself, not connected or bound up with any other article, but capable of and in fact containing some 50 gallons of this liquid, an amount capable thereby of being safely and conveniently handled and transported; each cask was marked to the consignee, and if separated from the car was capable of shipment independent thereof without either loss or inconvenience; the casks were shipped independently from Detroit to Sandusky by vessel, and then transferred to the car for shipment to Wheeling, their final destination. And holding the cask to be the "original package," it becomes unnecessary to consider to any extent the fourth ground of defense, that a seizure of 6 casks under a

warrant for 65 casks was unlawful. The warrant being for the whole shipment, the government, if it had the right of seizure at all, could take the whole or any part it could find in the original packages.

This brings us to the fifth and last defense relied upon, to the effect that this liquid extract was not shipped in these casks for the purpose of sale thus in bulk, but was so shipped to the owner thereof from one state to another for the purpose of bottling into small packages suitable for sale, and when so bottled it is admitted the bottles were labeled so as to express the content of alcohol and comply with the requirements of the act. A careful analysis of the provisions of the act has convinced me that this defense must be sustained. The language of the statute is:

"Any person who shall ship or deliver for shipment from any state or territory or the District of Columbia to any other state or territory or the District of Columbia, or to a foreign country, or who shall receive in any state or territory or the District of Columbia from any other state or Territory or the District of Columbia, or foreign country, and having so received shall deliver, in original unbroken packages, for pay or otherwise, or offer to deliver to any other person, any such article so adulterated or misbranded within the meaning of this act, or any person who shall sell or offer for sale in the District of Columbia or the territories of the United States any such adulterated or misbranded foods or drugs, or export or offer to export the same to any foreign country, shall be guilty of a misdemeanor." Section 10.

Again:

"Any article of food, drug, or liquor that is adulterated or misbranded within the meaning of this act, and is being transported from one state, territory, district, or insular possession of the United States, or if it be imported from a foreign country for sale, or if it is intended for export to a foreign country, shall be liable to be proceeded against in any District Court of the United States within the district where the same is found, and seized for confiscation by a process of libel for condemnation."

These provisions must be construed strictly in favor of the accused. So construed, I am persuaded they must be held to mean that any one owning an adulterated or misbranded food or drug product who ships to another in another state such product is guilty; that any one having received such product so shipped from another state by the owner or seller thereof, who shall, in the state where so received, deliver or offer to deliver such product to another in the original package, for pay or otherwise, shall be guilty; that any person who has received such product from any other state, who sells or offers it for sale, whether in the original package or not, in the District of Columbia or the territories, is liable. Congress had no power except in the District of Columbia and the territories to prohibit one from manufacturing adulterated food and drug products; it had no power to prevent one anywhere from personally consuming such products; it did have power to suppress the manufacture of such in the District of Columbia and the territories, and by this act has done so; it had the further power to restrict in the course of commerce the transportation from state to state of such products, and it has done so; it had power, after such product was received from another state, to restrict its sale in the original package, and it has done so. It did not, in my judgment, have power to restrict one from manufacturing in one state such

product and removing it from that state to another for the purpose of personal use and not sale, or for use in connection with the manufacture of other articles to be legally branded when so manufactured. The government's inspector was entirely justified in concluding that this shipment in these original package casks was a violation of this act, because they were consigned for shipment by Parke, Davis & Co. at Detroit, Mich., to the Knowlton Danderine Company at Wheeling, W., Va., and they were not branded. It was reasonably to be assumed that Parke, Davis & Co. were the owners and sellers, while the Knowlton Danderine Company was the purchaser. From the agreed statement of facts, however, it is apparent that the formula of the preparation is a trade secret; that Parke, Davis & Co. were not the owners of this formula, but only the manufacturing agents, under contract, of the owner, the Danderine Company, and only acted as agent for the owner in directing such shipment to the owner itself of its own property; that such owner did not, "having so received" such product, either "deliver, in original unbroken packages, for pay or otherwise, or offer to deliver to any other person," the same; nor did it "sell or offer for sale in the District of Columbia or the territories of the United States."

It seems clear that the transportation of this liquid was solely to the bottles made in Wheeling instead of the transportation of the bottles from Wheeling to the liquid manufactured in Detroit, and that it was so bottled in Wheeling and properly branded before any sale or disposition of it was attempted. Under such circumstances I am constrained to hold that the 6 casks must be surrendered to respondent, and the libel dismissed.