## MONAMOTOR OIL CO. v. JOHNSON, State Treasurer, et al.

No. 4197.

District Court, S. D. Iowa, W. D.

March 29, 1933.

George S. Wright, Addison Kistle, and Paul E. Roadifer, all of Council Bluffs, Iowa, for plaintiff.

John Fletcher, former Atty. Gen., Earl Wisdom and J. J. Hess, former Assts. to Atty. Gen., Edward L. O'Connor, Atty. Gen., and C. E. Hamilton and L. W. Powers, Assts. to Atty. Gen., for defendants.

Before KENYON, Circuit Judge, and SCOTT and DEWEY, District Judges.

DEWEY, District Judge.

Complainant's bill attacks the validity and method of enforcement of the motor vehicle fuel tax statutes of the state of Iowa.

Jurisdiction is invoked on diversity of citizenship of the parties and on account of a controversy arising under the Constitution and laws of the United States, the amount in controversy exceeding the limitation.

The complainant insisting upon interlocutory orders, a three-judge court was instituted and convened and the cause came on for hearing before such court on the demand for a temporary injunction. When the court was assembled and the cause called, by agreement of the parties, the trial was made a final hearing on the merits.

In 1925 the 41st General Assembly of the state of Iowa (chapter 6), in keeping with the demand for better roads all over the United States, passed an act having to do with the improvement of the highways of the state imposing a license fee or tax on gasoline or motor vehicle fuel used or otherwise disposed of in the state of Iowa, and providing for a levy, collection, payment, refund, and distribution. This act has been amended and now appears in the Code of Iowa 1931, as chapter 251-A1, the entire chapter being set out.

That chapter, which may be referred to herein as the 2-cent statute and, in so far as the same is material here, provides as follows:

"5093-a1. *Amount of Fee.* A license fee of two cents per gallon or fraction of a gallon is hereby imposed on all motor vehicle fuel used or otherwise disposed of in this state for any purpose whatsoever. Any person using motor vehicle fuel within the state shall be liable for the fee herein provided for unless the same shall have been previously paid. License fees shall be collected and disposed of in the manner hereinafter provided.

"5093-a2. * * * The term 'distributor' as used in this chapter shall mean any person who brings into the state or who produces, refines, manufactures or compounds within the state any motor vehicle fuel to be used within the state or sold or otherwise disposed of by him within the state for use in the state. * * *

"5093-a3. * * * Any person who sells or offers for sale at retail motor vehicle fuel in this state, shall keep posted in a conspicuous place, * * * a placard showing the total sale price per gallon including license fee, of all grades of motor vehicle fuel sold, said placard to have printed thereon the words 'state license fee included'.

"When quantity discounts or rebates are allowed, such facts shall be shown on the placard. * * *

"5093-a4. * * * Each distributor * * * shall * * * procure a license from the treasurer of state permitting said distributor to transact said business within the state of Iowa. * * *

"5093-c2. * * * He [distributor] shall first file with the treasurer of state a statement showing financial responsibility satisfactory to said department, or a corporate surety bond payable to the state of Iowa in the penal sum of one thousand dollars, conditioned that said distributor will pay to the state of Iowa any and all fees required by the law. * * *

"5093-a5. * * * On or before the twentieth day of each calendar month each distributor * * * shall file in the office of the treasurer of state, at Des Moines, Iowa, a * * * report * * * prescribed and furnished by said treasurer, showing the total number of gallons of motor vehicle fuel * * * imported by him during the preceding calendar month, the date of receipt, unloading point, tank car identification and in-

voiced gallonage of each and every tank car or other receptacle in which motor vehicle fuel is imported * * *. At the same time he shall remit to the treasurer the amount of the license fee for such preceding month * * * a deduction of three per cent of the invoiced gallonage imported may be made for evaporation and loss.

"If, after the prescribed license fees are so remitted and paid, any motor vehicle fuel in the possession of a licensed distributor is destroyed * * * before being sold or used by him * * * the said treasurer is authorized to certify to the amount of the license fees so paid thereon to the auditor of state as a refund. * * *

"If any distributor * * * shall fail to remit on or before the twentieth of each month to the treasurer of state to cover the license fees due on that date, a penalty of ten per cent of the amount thereof shall immediately accrue. * * * If any such distributor shall fail to pay such license fees and penalties within ten days after the date due, the attorney general shall bring appropriate action for the recovery of such license fees and penalty; and in addition whenever any licensed distributor fails to render the prescribed reports, * * * or fails to pay the license fee due within the prescribed time, the treasurer of state may revoke the license of such distributor. * * * Neither this act nor any of its provisions shall apply to foreign or interstate commerce. * * *

"5093-a6. * * * The books, records, papers * * * and equipment of any distributor which pertain to the sale of motor vehicle fuel shall be subject to inspection. * * *

"5093-a7. * * * Any distributor * * * who shall fail to make * * * the reports * * * or shall refuse to permit the treasurer to examine the books, * * * of such distributor pertaining to the sale of motor vehicle fuel, * * * shall be deemed guilty of a misdemeanor. * * *

"5093-a8. * * * Any person who shall buy or use any motor vehicle fuel * * * for any other commercial use except for propelling motor vehicles operated in whole or in part upon the public highways of the state or upon the streets of any city or town in the state, shall be reimbursed and repaid the amount of such license fee paid by him. * * *

"5093-a9. *Distribution of Proceeds.* License fees collected under the provisions of this chapter shall be distributed and disbursed as follows: One-third to the primary road fund. Two-thirds to the secondary road construction fund of the several counties of the state. The treasurer shall apportion said two-thirds portion among the counties of the state in the ratio that the area of each county bears to the total area of the state, and shall, on the first day of each month, remit to the treasurer of each county the amount apportioned to the secondary road construction fund of the county. * * * "

Two years later the 42d General Assembly, by chapter 101, revised and codified the statutes of the state with reference to the primary road system and the primary road fund of the state, and at the same session by chapter 103 amended the law as it appeared in chapter 101. These statutes covered a different subject-matter than the 2-cent statute.

The second paragraph of the first section of this amendment provides for a 1-cent tax on gasoline, and as it now appears in the Code of Iowa 1931 reads as follows: "4755-b38. *Motor Vehicle Fuel—Additional Tax.* There is hereby levied on all motor vehicle fuel imported and used within this state a license fee of one cent per gallon, which shall be in addition to the license fee levied by chapter 251-A1. All of the provisions and conditions of said chapter 251-A1 relating to the levy, collection or payment of the license fee on motor vehicle fuel shall apply with equal force to the license fee levied herein. Out of the proceeds of said additional license fee the state highway commission shall, each year, set aside a sufficient amount to pay the portion of the bridge, culvert, and right of way refund becoming due and payable on January first of the succeeding year. The remainder of the proceeds of said additional license fee shall be credited to the primary road fund."

### Facts.

The claim of the plaintiff that the officers of the state are enforcing the motor vehicle fuel tax statutes in an unconstitutional manner and the affirmative defenses of the defendants require consideration of some of the facts introduced at the trial. Most of the salient facts are stipulated by the parties and are adopted as fact findings by this court.

The MonaMotor Oil Company is a foreign corporation, incorporated in Arizona and doing business in Iowa. The defendants are officers of the state of Iowa as designated. The oil company's business is quite extensive as it operates 30 service stations in the state of Iowa and leases 29 other service stations; it maintains bulk stations for the storing of

gasoline at Council Bluffs, Iowa, and both imports and exports motor vehicle fuel and kindred products; it imports motor vehicle fuel into Iowa in tank cars and trucks for sale through its stations and also to other distributors and dealers in the state and supplies distributors and dealers outside of the state in wholesale quantities and this business has been carried on by the oil company for many years. Up to April 1, 1932, it refined gasoline at Carter Lake, Iowa, and since that time has been blending and compounding gasoline at that place.

Carter Lake, Iowa, is in Pottawattamie county, Iowa, and is on the west side of the main channel of the Missouri river and in moving gasoline from Carter Lake, Iowa, to other points in Iowa, it is necessary that such gasoline pass through the state of Nebraska. At Carter Lake it maintained bulk and storage tanks for the storage of gasoline, refined, blended, compounded, and also purchased by said company. Sales of gasoline are made from the bulk stations at Council Bluffs, Iowa, to many dealers in Nebraska, Minnesota, South Dakota, and other surrounding states, and many such deliveries are made to customers in the city of Omaha, Neb., from the bulk station and refinery at Carter Lake, Iowa.

On the 3d day of June, 1927, it applied for and was granted a license to transact business as a distributor in the state of Iowa from the treasurer of state. Since that time and until the commencement of this action it has made regular reports to the treasurer of state on blanks furnished by the treasurer and duly paid the taxes due as shown by the reports filed, except payments for the months of June, July, and August, 1932, were protested. That portion of the motor vehicle fuel produced, refined, blended, manufactured, or compounded within the state of Iowa during the time covered by complainant's bill and shipped through Nebraska into Iowa was mingled in Iowa with motor vehicle fuel shipped into Iowa from outside of the state during the said period and all of such gasoline or motor vehicle fuel, whether imported or compounded, was sold at the same price when sold in Iowa. The oil company reported and paid the prescribed tax on the motor vehicle fuel blended, compounded or refined at Carter Lake, Iowa.

The report forms are headed: "Report of Motor Vehicle Fuel Imported into the State of Iowa," and provided in separate columns for information as to "Date Unloaded;" "Station where Unloaded;" "Initial (and) Number (of) Tank Car;" "Other Container;" "Invoiced Gallonage;" and "Name of R. R. or other Carrier." It then provides for a showing as to the total invoiced gallonage imported; for deductions for evaporation and loss of 3 per cent. of gallonage; for gallonage sold and delivered outside of the state of Iowa, to be itemized under another form attached; for total deductions and net gallonage on which a license fee is due at 3 cents per gallon and also provides for a penalty, if any.

These reports were due on the 20th of each month and required a report as to gasoline transactions occurring during the preceding month. The treasurer of state collected from the distributor a 3-cent gasoline tax on gasoline imported within the preceding month and unloaded in Iowa and not exported therefrom without any showing or investigation or requirement as to whether the gasoline had been sold or used by the distributor or sold to the ultimate consumer, it being assumed that such disposition was made within the 20 days from the close of the month to the 20th of the following month when the report was due. Until the commencement of this suit no question was ever raised as to the disposition of the gasoline to the ultimate consumer or user prior to the 20th day of the following month and there is no evidence in this suit that any imposition has been made on any distributor on that account. In other words, the officers required a report of each month's business done by a distributor within the state of Iowa on the 20th day of the succeeding month and after deducting from gasoline imported and unloaded the 3 per cent. for waste and a further deduction of gasoline sold that was unloaded and exported without the state, required a payment of 3 cents per gallon tax from the distributor of all gasoline imported and unloaded and to be sold by the distributor within the state of Iowa. If gasoline was shipped in and not unloaded, it was not required to be included in the report. At one time the oil company requested the treasurer of state to treat gasoline imported to Carter Lake as being in Nebraska and called it the Omaha bulk station. They were granted this permission and subsequent reports were made on that basis.

Some time in the spring of 1932, agents of the state of Iowa reported that gasoline was being shipped into the state of Iowa by the MonaMotor Oil Company as petroleum lubricating oil but unloaded as gasoline into the gasoline tanks at Council Bluffs and they claimed that about 40 cars were thus so han-

dled. The invoices had been changed by employees. As originally written "gasoline," the letters "oline" were erased and the word "oil" written in place of it. It was shipped as gas oil and billed as lubricating oil, but when loaded was gasoline and when unloaded was gasoline. On investigation it was learned that these imports were not reported to the state. About April 8 or 9, 1932, a conference was held between some of the state officers and officers of the MonaMotor Oil Company at Council Bluffs with reference to an audit. The state officers refused to permit an audit to be made by the auditors of the oil company and it was agreed that it might be made by an independent company. A few days later an audit was commenced by the independent firm of Wolf & Co. and this audit was returned to the secretary of state; the audit covering the period from January 1, 1929, to March 29, 1932. Upon the receipt of this audit the state treasurer demanded fees aggregating $24,959.10, as not having been paid. The attorneys for the oil company asked for and were granted time to verify the figures of Wolf & Co. audit and we refer to the evidence of Mr. Hess, who was at that time handling the matter as an attorney for the state, as to what followed:

"Well, I spoke to Mr. Wright about it several times, urging him to hurry the matter up so that we could get it disposed of. Mr. Johnson (State Treasurer) was urging that the matter be gotten out of the way, and finally, about the early part of October, Mr. Petersen in the meanwhile getting in touch with the auditors of the Barnsdall Company, I think Mr. Votrain, and they had determined that the gallonage of the Wolf report was accurate, with the exception of two cars, that they were unable to place or trace or something, and I came down to Des Moines and talked with Mr. Johnson about it. He said 'If we are that near together, you go and tell Mr. Wright if they will pay this amount we will deduct the two cars, and eliminate the only matters that are questionable.' So I went and saw Mr. Wright the next morning, and talked with him, and I think perhaps with Mr. Kistle, and they informed me Mr. Resser would be in town in the afternoon, and the matter would be submitted to him. I did nothing then; they were to let me know in the afternoon what Mr. Resser said about paying. Mr. Wright phoned me while I was in court that afternoon. I did not get the message until late in the afternoon, at which time I called Mr. Kistle, or Mr. Wright's office, and Mr. Kistle was there, and he said then that they would meet with Mr. Fletcher and Mr. Johnson and myself, and show us they did not owe us anything, or something of that kind. The next morning I reported that to Mr. Johnson. Then he directed me to start this suit. Q. Was that before the cancellation of the license? A. Oh, yes, that was before the cancellation of the license. I had previously been all over these matters with Mr. Johnson, so he knew just what the record was." The testimony of the witness above referred to is not denied by complainant.

On the 14th of October, 1932, the state of Iowa and the state treasurer started an action in the state court to recover the fees theretofore demanded and accompanied the same by writs of attachment on the property of the oil company. This case was later transferred to the United States District Court but was remanded on a motion of the plaintiffs on the ground that it was an action by the state of Iowa. Also on the 9th day of April, 1932, certain informations were filed charging officers of the company with violation of the state laws in filing false and incomplete reports and returns of gasoline and motor fuel and later, at the August, 1932 term of the District Court of Pottawattamie county, Iowa, ten indictments charging the MonaMotor Oil Company and certain officers with violations of the state motor vehicle fuel law were returned by the grand jury of Pottawattamie county, Iowa, and upon these indictments pleas of guilty were entered by some of the officers, fines assessed, and the remaining indictments dismissed. On October 14, 1932, the state treasurer canceled the license which had been issued to the MonaMotor Oil Company as a distributor and in writing advised the company of his action. The license was cancelled by the state treasurer upon the information contained in the Wolf & Co. audit. No notice of or hearing was held by the state treasurer of an intention to cancel the license. All this was done before the suit was commenced in this court. The present state treasurer says that he has no intention of further law actions against the MonaMotor Oil Company until the present litigation is terminated and his rights are determined by the courts.

No gasoline has ever been produced or refined in Iowa, except that refined by the MonaMotor Oil Company at Carter Lake, Iowa, prior to April 1, 1932. Since that time it has at that place been blending or compounding gasoline. The L. L. Coryell Oil Company has been engaged in blending or compounding certain gasoline in Iowa from naptha and they have failed or refused to pay

certain taxes on gasoline they have blended out of naptha. Suit is now pending against the Coryell Company for the tax on that blended product and the state has through its officers at all times insisted that the naptha and blended gasoline are imported gasoline upon which a tax should be paid and there has been no discrimination by the officers of the state in this regard.

### Issues.

The complaint was filed October 17, 1932, and is very voluminous, prolix, and involved. It sets out and complains of the actions of the state officials in instituting the civil and criminal proceedings against it and revocation of its license by the state treasurer. It alleges the nature of the business carried on by the complainant and as established by the facts at the hearing, and attacks the constitutionality of the statutes. It alleges that the 2-cent statute above referred to is unconstitutional and void by general allegations reiterated, and specifically complains that the act is an imposition upon the interstate commerce carried on by the complainant and that the officers under and by virtue of the provisions of the act have been and are acting and will continue to act unlawfully in demanding under duress a cancellation of its license, criminal actions, etc., for enforcing the collection and payment on all gasoline imported by it; and their acts in so enforcing the statutes compelled and will in the future compel the complainant to pay a tax on all gasoline imported, thus interfering with its interstate business; and in treating the act in all respects as though it were a direct tax and liability of the importer to pay 3 cents a gallon on all motor vehicle fuel imported by it and thus make it a direct tax on gasoline instead of upon the user as contemplated by the statutes; that the cancellation of its license by the treasurer was done without notice to it of the intended act of the treasurer in so canceling the license, and the statutes of Iowa do not afford an opportunity to be heard thereon and it deprived the complainant of property without due process of law; that the manner of the collection of the tax by the state officers places on the interstate business of the complainant a direct burden; that the provision of the statute with reference to a refund allows any person who buys or uses motor vehicle fuel for any purpose other than operating a motor vehicle on the highway to make application for the refund of the 3 cents per gallon from the officers of the state of Iowa, which is a direct violation of the Constitution of the United States and of the state of Iowa, in that the result is to impose or an attempt to impose a tax on the complainant as a distributor for the benefit of any person who shall buy or use any motor vehicle fuel for any other purpose than the operation of the motor vehicle on the highways and imposes on the distributors a tax for the benefit of another class of persons, to wit, the users of the motor vehicle fuel for purposes other than the operation of motor vehicles on the highway; that the attempted enforcement thereof is in violation of the Constitution in that it is the levying of a tax for other than a public use or a public benefit.

In addition to the attack on the 2-cent statute, the complaint alleges that the statute providing for the additional 1-cent levy is unconstitutional for several additional reasons: First, that the law was never enacted—as chapter 103 of the Acts of the 42d General Assembly above referred to in amending chapter 101, wherein is contained the enactment with reference to the 1-cent tax, strikes therefrom the words and figures "three" and does not enact anything in lieu thereof; the insertion of the provisions wth reference to the 1-cent tax being therefore not a real part of the act itself. Second, that the title of the act expresses no object to which the tax is applied but refers to another law to fix such tax or object in violation of the Constitution of the state of Iowa. Third, that the proposed tax is a property tax and imposes a burden on interstate commerce and denies to the distributor the equal protection of the law; that it also discriminates against the complainant as an importer of gasoline in favor of any gasoline that might be manufactured and used in the state of Iowa. Fourth, that this tax imposes a direct burden on interstate commerce. Fifth, that it imposes on the complainant the duty to report on imported gasoline only and attempts to compute the tax on such imports only and attempts to enforce the payment of a tax laid and levied upon users of the gasoline upon the distributor without any provision in the statute to make a distributor liable for the payment of such tax.

The defendants in answering the bill of complaint allege affirmative defenses that the bill is in truth and in fact an action against the state of Iowa and cannot be maintained in this court; that it is an action brought to restrain the prosecution of an action pending in the state courts of Iowa and to restrain the officers of the state of Iowa from prosecuting said action; that after the enactment

196

of the laws attacked and referred to herein, plaintiff paid the tax without protest prior to the month of June, 1932; that no attack had been made upon the constitutionality or legality of any of these acts prior to this suit in the courts of the state of Iowa or the federal courts and that in reliance upon the license fees and the constitutionality of the provisions of the statutes in question, the counties of the state of Iowa in contemplation of the payment of the taxes voted road improvement bonds in the sum of $100,000,000; that the complainant knew of this situation and by reason of its failure to protest or challenge the validity of the laws in question prior thereto would injure the counties relying thereon and complainant is now estopped from doing so; that as an additional defense the answer alleges that under the statutes the distributor was only a collector of license fees; that in so collecting such fees it holds them as the agent of the state of Iowa; that it has collected and will collect future license fees and now holds certain license fees which it has collected from the users of gasoline on the highways and that the complainant is therefore without equity in this action to restrain the state and its officers from collecting and receiving the collection of such license fees; that complainant is in no manner prejudiced by the action of the state and its proper officers, as they are only endeavoring to charge and collect from the distributors that which the distributor has already charged and collected from the ultimate users of motor vehicle fuel.

We have perhaps not touched upon all of the claims of the parties as the pleadings are voluminous, but in general they are as above set forth.

The relief demanded by the petitioner in this suit is for injunctions, temporary and permanent, enjoining and restraining the defendants from taking or commencing any further steps or proceedings, suits, or actions to collect the motor vehicle fuel taxes and taking any steps to prevent the plaintiff from transacting business in the state of Iowa.

### Jurisdiction.

The defendants challenge the jurisdiction of this court on the ground that the suit is against the state as in contravention of the Eleventh Amendment to the Constitution. The Supreme Court of the United States has repeatedly held that the federal courts have jurisdiction to restrain officers of the state acting or purporting to act under unconstitutional statutes or acting un-

der color of state statutes in an unconstitutional way or manner.

Their last pronouncement on this question is found in the case of Sterling et al. v. Constantin et al., 287 U. S. 378, 53 S. Ct. 190; 193, 77 L. Ed. ——, decided December 12, 1932. Therein it is said:

"The District Court had jurisdiction. The suit is not against the state. The applicable principle is that, where state officials, purporting to act under state authority, invade rights secured by the Federal Constitution, they are subject to the process of the federal courts in order that the persons injured may have appropriate relief. * * * Nor does the fact that it may appear that the state officer in such a case, while acting under color of state law, has exceeded the authority conferred by the state, deprive the court of jurisdiction. * * *

"As the validity of provisions of the state Constitution and statutes, if they could be deemed to authorize the action of the Governor, was challenged, the application for injunction was properly heard by three judges. * * * The jurisdiction of the District Court so constituted * * * extends to every question involved, whether of state or federal law, and enables the court to rest its judgment on the decision of such of the questions as in its opinion effectively dispose of the case."

Injunction proceedings to restrain state officers from enforcing state statutes that violate the Federal Constitution may be maintained against such officers. Terrace v. Thompson, 263 U. S. 197, 44 S. Ct. 15, 68 L. Ed. 255; Public Service Co. v. Corboy, 250 U. S. 153, 39 S. Ct. 440, 63 L. Ed. 905; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570; Western Union Tel. Co. v. Andrews, 216 U. S. 165, 30 S. Ct. 286, 54 L. Ed. 430; Ex parte Young, 209 U. S. 125, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Smith v. Tillitson (C. C. A.) 29 F.(2d) 535, 537.

### Concurrent Jurisdiction.

We are also met with the claim by the defendants that to grant the relief asked in this case would result in a stay of the proceedings instituted by the state of Iowa in the state courts of Iowa.

Section 265, Judicial Code, section 379, title 28, U. S. Code (28 USCA § 379), provides that "the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except * * * in bankruptcy."

It is fundamental that where a state and federal court have concurrent jurisdiction of the same parties and subject-matter, the tribunal where the jurisdiction first attaches retains it exclusively and will be left to determine the controversy and every issue properly arising in the case.

And it has been repeatedly held that the federal court cannot interfere with a proceeding in a state court by injunction. Riehle v. Margolies, 279 U. S. 218, 49 S. Ct. 310, 73 L. Ed. 669; Essanay Film Mfg. Co. v. Kane, 258 U. S. 358, 361, 42 S. Ct. 318, 66 L. Ed. 658; Hull v. Burr, 234 U. S. 712, 34 S. Ct. 892, 58 L. Ed. 1557; U. S. v. Parkhurst-Davis Mercantile Co., 176 U. S. 317, 20 S. Ct. 423, 44 L. Ed. 485; Dial v. Reynolds, 96 U. S. 340, 24 L. Ed. 644; Haines et al. v. Carpenter, 91 U. S. 254, 257, 23 L. Ed. 345.

In the words of Mr. Justice Bradley in Haines v. Carpenter, supra: "The great object of the suit is to enjoin and stop litigation in the State courts, and to bring all the litigated questions before the Circuit Court. This is one of the things which the Federal courts are expressly prohibited from doing."

The court first obtaining jurisdiction of a controversy should be permitted to proceed without interference. We are therefore expressly enjoined from interfering in any way with the proceedings now pending in the state court by the state or its officers in this case involving the same parties and the same subject-matter.

It is argued, however, that the proceedings in the state court are only an incident in this case and that it is one of the acts on the part of the officers of the state to compel this complainant by duress to pay taxes on motor vehicle fuel under an unconstitutional statute or in an unconstitutional manner.

Since the institution of this suit by the MonaMotor Oil Company, other oil companies have started similar suits in this court and the state courts in Iowa asking similar relief, and, as the MonaMotor Oil Company is refusing to pay further taxes under the Iowa statutes, or paying them under protest, we feel that the questions raised by the claimant in this suit should be determined in so far at least as they do not interfere with the issues raised by the state in the suit now pending in the district court of Pottawattamie county, Iowa.

### Interpretation of the Statutes.

One of the contentions of the complainant is that the 2-cent statute is unconstitutional, because it imposes a burden on interstate commerce; the argument being that as section 5093-a5 provides that the distributor shall report as to all motor vehicle fuel imported during the preceding month and the invoiced gallonage of each tank car or other receptacle in which motor vehicle fuel is imported into the state, followed by a provision that at the same time he shall remit the amount or license fee for the preceding month, is a pronouncement requiring payment of a fee for imports only which would be an interference with motor vehicle fuel imported by it and exported to other dealers.

It is also a claim that the statute is unenforceable and void because of indefiniteness. These among other claims require an interpretation by the court of the several motor vehicle fuel statutes.

The 2-cent statute is levied on all gasoline used or otherwise disposed of in the state, but under the familiar doctrine of ejusdem generis where general terms follow specific terms they are limited and applicable only to the same general class as the specific terms used. The 2-cent statute, as far as the levy is concerned, should be read as meaning, used or consumed in the state.

The liability for the payment of the tax by section 5093-a1 is definitely placed on any person using motor vehicle fuel within the state, unless the same shall have been previously paid. The statute therefore, having provided for the levy and the persons liable, expressly states in section 5093-a1 that these fees or taxes shall be collected and disposed of in the manner hereinafter provided.

The tax is imposed against the gasoline used or consumed on the highways of the state (State v. Northern Iowa Oil Co., 209 Iowa, 980, 229 N. W. 214); but the liability for its payment is placed upon the persons using or consuming the fuel and hence it is an excise rather than a direct tax (Bowman v. Continental Oil Co., 256 U. S. 642, 41 S. Ct. 606, 65 L. Ed. 1139).

As to the collection of the tax the Legislature has set up a plan whereby all distributors of gasoline, defining them, are to take out licenses without cost from the state authorizing them to do business within the state of Iowa as such distributor so long as they comply with the statutes, that they file a bond or cash deposit at the time the license is issued to them conditioned on payment to the state of Iowa of any and all fees required by the law. Section 5093-c2.

Further then in carrying out his duties as a distributor, the law provides that on or

before the 20th day of each calendar month the distributor shall file in the office of the treasurer a report showing the number of gallons of motor vehicle fuel imported by him during the preceding calendar month, the invoiced gallonage of each car or other receptacle in which the fuel was imported, the date of receipt, unloading point, and the identification of the tank car. In the same section, section 5093-a5, is a requirement that the distributor at the time of making this report shall remit to the treasurer the amount of the license fee for such preceding month.

■ This provision in section 5093-a5 is not as clear as it should be, but in the light of the other provisions of the statute, it is perfectly apparent that it was the intention of the Legislature that payment should be made on the 20th day of each month for all gasoline imported during the preceding month, unloaded and to be used or consumed within the state of Iowa. It is very apparent that the distributor may be required to pay some of the license fees in advance, based upon the report filed if he has not collected on all of the gasoline imported and unloaded by him during the preceding month.

■ That it was the intention of the Legislature to require of the distributor payment of the tax, but that it should not be a tax assessed against him but only as an administrative feature in the enforcement of the act, is clearly shown by an amendment to section 5093-a5 which was made by the 42nd General Assembly in 1927. The original act provides as follows: "Sec. 5. *Monthly Report—Remittance.* Each distributor of gasoline shall, on or before the twentieth (20th) of each calendar month, forward to the treasurer, a statement, sworn to by one of its principal officers, showing the total number of gallons of gasoline imported by him and the total number of gallons of gasoline sold or otherwise disposed of for the preceding calendar month and shall at the same time remit to the treasurer the amount of the license fee for such preceding month for which such distributor is liable." Chapter 6, Laws of the 41st General Assembly.

The enactment of the 42d General Assembly in lieu of the foregoing was: "On or before the twentieth day of each calendar month each distributor of gasoline shall file in the office of the treasurer of state, at Des Moines, Iowa, a duly acknowledged report on forms prescribed and furnished by said treasurer, showing the total number of gallons of gasoline imported by him during the preceding calendar month, the date of receipt, un-

loading point, tank car identification and invoiced gallonage of each and every tank car or other receptacle in which gasoline is imported into the state of Iowa. At the same time he shall remit to the treasurer the amount of the license fee for such preceding month; provided, however, that in computing said amount a deduction of three per cent of the invoiced gallonage imported may be made for evaporation and loss. * * * " Section 4, chap. 248 (Senate File 347), Laws of the 42nd General Assembly.

It is observed then that the Legislature took out of the original act the statement, "and the total number of gallons of gasoline sold or otherwise disposed of," and also the phrase, "for which such distributor is liable." It is perfectly apparent therefore that the purpose and intention of the Legislature was to omit from the act any statements therein that could in any wise be interpreted as an intention on their part to levy a tax on the gasoline sold or otherwise disposed of by the distributor and which might be construed as making the distributor primarily liable for the tax itself. They also placed into the act the provisions with reference to the report to include the date of receipt, unloading point, etc. Any doubt of the construction should be dispelled when we consider that the Legislature at the same time provided that if after the license fees are so remitted and paid before being sold or used by the distributor any gasoline is destroyed, the state would reimburse the distributor therefor. Also, there was added into the new act a provision that in computing the amount of the license fee which should be advanced and paid by the distributor, there was to be an allowance to him of a 3 per cent. deduction from the invoiced gallonage imported for evaporation and loss.

■ A refund is permitted to any consumer who has purchased motor vehicle fuel for any commercial use except propelling motor vehicles operated on the highways of Iowa to the amount of the license fee paid by him.

The ultimate consumer using the highways of the state pays the tax.

And the provision of section 5093-a1, that "any person using motor vehicle fuel within the state shall be liable for the fee herein provided for unless the same shall have been previously paid," must mean, when construed with the other provisions of the act, "unless the same shall have been previously paid" by some other person liable therefor.

While that part of the statute providing for collection by the distributor from the

consumer the tax advanced by him is not as clear as it might be, there can be no doubt of the intention of the General Assembly, as section 5093-a3 provided for a notice to be posted by the retailer to inform the purchasing public that such retailer is paying or has paid a tax of 3 cents on each gallon of gasoline to be sold. Central Transfer Co. v. Commercial Oil Co. (D. C.) 45 F.(2d) 400, 402.

Upon consideration of the entire act the intention of the Legislature is readily apparent: First, a levy is made upon all motor vehicle fuel used or consumed in the state; second, the person or persons using the fuel within the state are made liable for the payment of the fees; third, a refund is granted to users of such motor vehicle fuel other than users on the public highways; and, fourth, the distributor for the privilege of selling and dispensing of gasoline within the state of Iowa is to be a toll collector and administer the collection of the tax making his reports as required by section 5093-a5, and in either paying or advancing the tax on the 20th day of the month following that on which the gasoline was imported and unloaded by him.

■ Questions of the necessity of administration are practical matters and have to be indulged in by the state. Some one must pay the tax before it is ultimately used or consumed, as even the ultimate consumer has to advance the fee before he uses or consumes the gasoline. A distributor of gasoline has no inherent rights to sell and dispense gasoline in the state of Iowa and, on account of the nature of the product that he handles, the state has a right to require of him in consideration of his right to dispense gasoline within the state the administrative acts as provided by the statutes. Laws providing for the licensing of a dealer or distributor and requiring that he advance the tax afterwards to be collected from the consumer and wherein are contained provisions for users of gasoline for purposes other than propelling motor vehicles upon the highways to obtain a refund of the tax paid to the dealer or distributor have been held constitutional by a great number of the state and federal courts. Foster & Creighton Co. v. Graham, 154 Tenn. 412, 285 S. W. 570, 47 A. L. R. 973; Miller v. People, 76 Colo. 157, 230 P. 603, 39 A. L. R. 269; Gafill v. Bracken, 195 Ind. 551, 145 N. E. 312, 146 N. E. 109; Standard Oil Co. v. Brodie, 153 Ark. 114, 239 S. W. 753; Standard Oil Co. v. Jones, 48 S. D. 482, 205 N. W. 72; State v. City of Sioux Falls (S. D.) 244 N. W. 365; State v. Hart, 125 Wash. 520, 217 P. 45; People v. Deep Rock Oil Corp.,

343 Ill. 390, 175 N. E. 572; Pierce Oil Corp. v. Hopkins (C. C. A.) 282 F. 253; Schevenell v. Blackwood (C. C. A.) 35 F.(2d) 421. Many of these cases directly and properly determine questions here raised.

### One-Cent Tax Statute.

As the provisions and conditions of the 2-cent statute relating to the levy, collection, or payment of the license fee are to apply and be added to the one cent statute, (sec. 4755–b38), its interpretation is practically the same as the 2-cent tax statutes. The 2-cent tax is levied on all gasoline used or consumed in the state and the 1-cent tax on all gasoline imported and used in the state. As the terms used and consumed have practically the same meaning, the only difference is that in the 1-cent statute gasoline to be taxed in Iowa is to be both imported and used.

■ It is true, as pointed out by complainant, that the 1-cent statute does not expressly refer to the refunds but, on account of the relationship between these two statutes and the cross-reference therein to the provisions and conditions of the 2-cent statute, it is apparent that it was the intention of the Legislature to make the ultimate consumer or user of the gasoline on the highways of the state primarily liable for the payment of the tax. Since the enactment of these statutes in 1927, all distributors of motor vehicle fuel in Iowa have so interpreted it and the users of gasoline have at all times enjoyed the refund provisions of the act with reference to both the 2-cent and the 1-cent statute.

But if refunds are allowed to persons other than users of gasoline on the highways of the state, it does not affect this claimant. It is a distributor, not a user of gasoline. Its duties are to pay to the state of Iowa all the license fees on gasoline or motor vehicle fuel which it collects from users of such motor vehicle fuel.

There is no gasoline distilled in Iowa other than at the plant at Carter Lake, Iowa, hence there is no discrimination on this account as against the complainant in this case. The Legislature may have had in mind that all gasoline used within the state of Iowa must necessarily be imported.

### Interstate Commerce Provisions of the Statutes.

■ Complainant seeks to take advantage of the statement in section 5093-a5 that "neither this act nor any of its provisions shall apply to foreign or interstate commerce." The argument is that this provision entirely

emasculates the provisions of the act as they expressly refer to imports of gasoline by the distributor. These provisions, however, wherein the importations are referred to, have to do with the administration of the collection of the tax and not with its levy, collection, or payment. A literal construction of a statute leading to absurd results should be avoided if possible. Gulf States Steel Co. v. United States, 287 U. S. 33, 45, 53 S. Ct. 69, 77 L. Ed. 150. And this provision when properly construed tends more to disrupt complainant's theory of the statute than to support it. When it is read in connection with the rest of the act, it is clearly apparent that it was the intention of the General Assembly to disclaim any intention of interference with foreign or interstate commerce and that the provisions of the act should be so construed.

### Constitutionality.

 A main contention of complainant is that the 1-cent statute levying a tax on motor vehicle fuel imported and used in this state; section 5093-a5 providing for reports on imported motor vehicle fuel; and the manner and method of their enforcement by the state officers, violate the commerce clause of the Constitution (Const. art. 1, § 8, cl. 3), in that it places a burden upon its interstate commerce. The above interpretation of the statutes answers many of its contentions. The word "imported" in the 1-cent statute is a word of limitation and it would be a violent interpretation to say it meant a levy on motor vehicle fuel while being both imported and used.

The Legislature very carefully refrained from placing a tax on the distributor and a different situation is presented than the statutes declared unconstitutional on this account by the Supreme Court of Illinois in the case of Chicago Motor Club v. Kinney, 329 Ill. 120, 160 N. E. 163. The requirement of the reports as to motor vehicle fuel imported is administrative only and has repeatedly been held not a burden on interstate commerce. Bowman v. Continental Oil Co., 256 U. S. 642, 41 S. Ct. 606, 65 L. Ed. 1139. The state officials as shown by the reports base their findings as to the amount of license fees due on the gasoline as unloaded, giving credit or not endeavoring to hold the distributor accountable for gasoline reshipped out of the state after unloading.

It has been repeatedly held that a state may put an excise tax on a commodity of trade or commerce when such commodity has finally come to rest in the state. Superior

Oil Co. v. State of Mississippi, 280 U. S. 390, 50 S. Ct. 169, 74 L. Ed. 504; Nashville, etc., Ry. v. Wallace, 53 S. Ct. 345, 77 L. Ed. ——, decided February 16, 1933.

### Iowa Constitution.

 But it is claimed that the 1-cent statute is of no force and effect because it was never enacted; because the title to the act creating the law did not in any manner refer thereto and is defective; and because the act expresses no object to which the tax is to be applied, but refers to another law to fix such tax or object.

The constitutional provisions are as follows:

Article 3, § 29, of the Constitution of Iowa: "*Acts—One Subject—Expressed in Title.* Sec. 29. Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title."

Article 7, § 7, of the Constitution of Iowa: "*Tax Imposed Distinctly Stated.* Sec. 7. Every law which imposes, continues, or revives a tax, shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object."

The three challenges may be considered together. It is perfectly apparent that the object of the tax is distinctly stated and that neither the tax or the object therefor is enacted by reference to any other law or statute.

The reference to the 2-cent statute was to its provisions and conditions, as to the levy, collection, and payment of the new tax. It does not make such reference for the purpose of fixing such tax, nor for the purpose of fixing the object for which the tax was levied. They are both contained in the act itself.

The right to thus cross-reference to provisions of other statutes or to the federal statutes seems to be quite uniformly recognized. Ballard-Hassett Co. v. Local Board of Review (Iowa) 246 N. W. 277, 278.

One theory of complainant is that section 5093-a5 imposes a direct tax on the distributor, and hence there is a reference to another statute to fix the tax against him. But there is no tax levied on him; the liability once placed on the distributor was by section 4 of chapter 248 of the Laws of the 42d General Assembly expressly repealed.

The other objections are that the tax was not specifically referred to in the subject of the act.

The title to chapter 103, Acts of the 42d General Assembly, is as follows:

"An Act to amend the law as it appears in senate file number one hundred four (104) as enacted by the forty-second general assembly of the state of Iowa, relating to the improvement of the primary road system and the appointment of members of the highway commission and an auditor therefor."

The title to chapter 101 of the 42d General Assembly, senate file 104, is as follows: "An Act to amend, revise, and codify sections forty-six hundred twenty-two (4622) * * * of the code, 1924, relative to the primary road system and the primary road fund, to transfer the control of the primary roads to the state, to empower the state to construct and maintain the primary road system, to do away with special assessments for paving primary roads, to refund for such assessments heretofore levied, to do away with the area basis for allotting primary road funds among the counties, to provide for an increase in the membership of the state highway commission, to further prescribe their rights and duties, and limiting their powers with respect to creating an obligation against the state."

Chapter 103 of the 42d General Assembly refers to chapter 101 thereof, which it amends, which in turn amends, revises, and codifies certain sections of the Code of 1924 which were enacted by chapter 237, Acts of the 38th General Assembly. The title to chapter 237, Acts of the 38th General Assembly, and sections 1 and 4 thereof, are as follows:

"An Act to co-ordinate the work of the state of Iowa and of the government of the United States relative to road improvements, to provide and to define a system of primary and secondary roads in each county and to provide for the extension of such primary system, to provide for the improvement and maintenance of such roads and to prescribe the procedure therefor, to extend certain options to each county in the improvement of its roads, to provide the funds to pay the cost of such improvements and to regulate the division, accounting and disbursement of such funds, to authorize, in certain cases, the levy of limited special assessments upon real estate which abuts upon or is adjacent to such road improvements, in order to defray a part of the cost thereof and to regulate and prescribe the procedure in consummating such assessments and the collection and application thereof. * * *

"Section 1. Highways—improvement of —system—funds—federal aid, etc. It is the intent of this act to divide the highways of the state and of each county into a primary and secondary system, to provide for the substantial and durable improvement of such primary roads of each county, to pay for said improvements on such primary roads from federal aid funds, motor vehicle registration fees, and from the proceeds of assessments on benefited real property. * * *

"Sec. 4. Primary road fund—how created —apportionment to counties, etc. There is hereby created a fund which shall be known as the primary road fund, which shall embrace the federal-county-co-operation road fund as created by chapter 249 of the laws of the thirty-seventh general assembly, all additional and future federal aid road funds, and all other funds derived from year to year by the state under acts regulatory of motor vehicles. * * *"

It can be seen therefore that the authority for the 1-cent license fee was found in the title to the original law; and the Supreme Court of Iowa has decided that in questions as to the sufficiency of the title, the courts look to the title of the original act in order to ascertain whether the amendatory act comes within the title of the original act. Cook v. Marshall County, 119 Iowa, 384, 401, 93 N. W. 372, 104 Am. St. Rep. 283; Fevold v. Board of Supervisors, 202 Iowa, 1019, 1033, 210 N. W. 139; and see McGuire v. Chicago, Burlington & Q. R. Co., 131 Iowa, 341, 108 N. W. 902, 33 L. R. A. (N. S.) 706; Id., 219 U. S. 549, 31 S. Ct. 259, 55 L. Ed. 328.

We are satisfied that when we consider the prior acts, of which the act in question is amendatory, and which it is fair to assume was in the minds of the legislators at the time the amendment challenged was before them for action, the general purposes of the act were sufficiently contained in the title to warrant the inclusion therein of a tax on gasoline to assist in the maintenance of the public highways of the state.

### Duress.

The bill as prepared strongly indicates that the complainant was laboring under considerable feeling when it was prepared and filed. It was the thought of the pleader that the actions of the state in starting civil actions to collect taxes which it claimed to be due, in starting the criminal proceedings, and in canceling the complainant's license as

a distributor, all indicated a feeling of malice towards complainant that entitled it to be protected by a court of equity through injunction. The facts above set forth would indicate, however, that the state was warranted in the proceedings taken. There was at least a justifiable reason and cause shown. The criminal cases have been entirely disposed of. Complainant herein has all the rights that it would have in this action to plead in the state case and raise questions as to the constitutionality of the State or Federal Constitutions. The treasurer of state also says that he does not intend any further proceedings in courts of law until his rights are determined by the actions now pending. No necessity therefore appears why this court should issue an injunction restraining the present treasurer of state from further proceedings either in law actions or criminal proceedings and we are unable to say that the state officials were not entirely within their rights in doing what they did do or that the situation as presented warrants equitable relief in this court.

Complainant says however that under these statutes it cannot refuse to pay the tax and thus raise the questions in a law action when sued whether distilling gasoline at Carter Lake, transporting it through Nebraska to Iowa is importing gasoline, or whether importing naptha and compounding it with other ingredients to produce gasoline is an importation of gasoline, as such act on its part would bring penalties and a revoking of its license. Such a situation may require equitable relief. Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764.

But no such situation here exists. No gasoline is being distilled at Carter Lake and no evidence was introduced that would warrant a finding that the compounding of gasoline within the state does not require the importation of motor vehicle fuel other than that upon which the tax is imposed and collected by complainant. Its distributor's license has already been revoked. If, as claimed, the action of the treasurer was arbitrary and without reasonable cause, the complainant may by proper proceedings have his action rescinded by the courts. This claim appears to have been raised as an excuse for failure to report gasoline imported rather than a basic ground upon which an outraged supplicant seeks relief from a court of equity.

### Revocation of the License.

Another claim is that the statute imposing the tax requiring payment, etc., under penalty of revoking the license to do business and without providing for a hearing thereon constitutes the taking of property without due process of law (Const. U. S. Amend 14). The argument consists of a citation and quoting excerpts therefrom in the case of Hoeper v. Tax Commission, 284 U. S. 206, 52 S. Ct. 120, 76 L. Ed. 248. That case holds that an attempt by a state to measure a tax on one person's property or income by reference to the property or income of another is contrary to due process of law. The holding is not analogous to the claimed invalidity of the revocation license statute. Section 5093-a5 provides: "If any such distributor shall fail to pay such license fees and penalties within ten days after the date due, the attorney general shall bring appropriate action for the recovery of such license fees and penalty; and in addition whenever any licensed distributor fails to render the prescribed reports, renders a false report to the treasurer, or fails to pay the license fee due within the prescribed time, the treasurer of state may revoke the license of such distributor."

There is no question but that this is a harsh penalty, but if the wisdom of the Legislature has prescribed the grounds on which the revocation may be had as a protection for the collection of money due the state, the courts cannot interfere.

The thought of the complainant evidently is that the distributor's license was canceled before it could have an opportunity of being heard in court as to whether or not the claimed license fees were legally due from it. It is quite generally held that where the nature of a business may be controlled by a state under the exercise of its police power and a license to conduct such business is properly required and issued, that for cause and without notice of hearing such a license may be revoked by the executive officer. Rehmann v. City of Des Moines, 200 Iowa, 286, 204 N. W. 267, 40 A. L. R. 922; Doyle v. Continental Ins. Co., 94 U. S. 535, 24 L. Ed. 148; 37 C. J. 247; 17 R. C. L. page 554.

Here the treasurer may cancel a distributor's license where the distributor fails to render the prescribed reports, renders a false report, or fails to pay the license fee due. If, as contended for by the complainant in this case, it did not fail to file reports, or submit a false report, or there was no license fees due on the product shipped from Carter Lake, Iowa, to Council Bluffs, Iowa, then it has recourse to the courts to set aside the action of the treasurer in a proper action as being arbitrary and unreasonable.

No relief of that nature is asked in this case.

### Discrimination.

It is claimed that the 1-cent statute is discriminatory because if gasoline were distilled or manufactured in Iowa it would escape the 1-cent statute as not being both imported and used. The short answer is that there is no such gasoline distilled or manufactured in Iowa except that which was distilled or manufactured prior to April 1, 1932, by the complainant company itself.

The party who invokes the power to declare a statute unconstitutional must be able to show not only that the statute is invalid but that he has sustained or is in immediate danger of sustaining some direct injury as a result of the enforcement and not that he suffers in some indefinite way in common with people generally. Massachusetts v. Mellon, 262 U. S. 488, 43 S. Ct. 597, 67 L. Ed. 1078; Williams v. Riley, 280 U. S. 79, 50 S. Ct. 63, 74 L. Ed. 175.

It is true there are questions raised as to whether naptha imported into Iowa and blended might escape the penalty of the tax on the ground that it was not motor vehicle fuel imported into Iowa, but the evidence does not disclose this to be the fact. The statute itself does not discriminate but treats all alike. The officers are not discriminating as they are insisting that the tax should be paid on naptha imported and blended as imported gasoline. Whether or not the 1-cent tax can be collected on motor vehicle fuel blended in the state of Iowa is a legal question which can and is being determined in law actions and does not now require equitable interference.

### Equitable Relief.

It is apparent that the distributors of gasoline in Iowa have uniformly, since the statutes were first enacted in 1927, collected the tax therein imposed from the ultimate consumer either before or after the tax was advanced by them to the state treasurer. It is also apparent that the complainant in this case has not only been doing this but it has collected under the statutes which it is now asking us to hold unconstitutional these very taxes which it is refusing to pay to the state of Iowa. It is also apparent that there is little criticism that can be advanced as against the 2-cent statute or its enforcement by the officers of Iowa. No offer or tender to pay back these taxes collected by the complainant or to pay the 2-cent tax and to refuse to pay the 1-cent tax is made in this suit, and to grant the relief asked would permit the complainant to retain these amounts collected. This situation invokes the rule that he who seeks equity must do equity. A court of equity should hesitate to permit a party to have a statute declared unconstitutional under which it has obtained and is retaining benefits. 10 R. C. L. (Estoppel) § 140.

### Findings of Fact, Conclusions of Law, and Order.

In accordance with the above opinion and the requirement of new Equity Rule 70½ (28 USCA § 723), findings of fact and conclusions of law are made and the same shall be entered of record by the clerk, as well as this opinion and order.

### Findings of Fact.

1. The facts stipulated by the parties and introduced in this case from 1 to 28, inclusive, are adopted as fact findings by this court and shall be entered as such by the clerk in keeping with rule 70½.

2. Payments for the months of June, July, and August, 1932, in keeping with the reports filed by the MonaMotor Oil Company in those months, were made under protest.

3. The officers of the state of Iowa in the enforcement of the motor vehicle fuel tax statutes under investigation required a report from each distributor doing business within the state and holding a license therefrom. The report form provided: In the heading, "Report of Motor Vehicle Fuel Imported into the State of Iowa;" and in separate columns for information as to "Date Unloaded;" "Station where Unloaded;" "Initial (and) Number (of) Tank Car;" "Other Container;" "Invoiced Gallonage;" and "Name of R. R. or other Carrier."

These reports were required to be filed and the tax paid on the 20th day of the month following the month's business reported. In keeping with the report, the state treasurer allowed 3 per cent. for waste and a deduction for gasoline sold and exported without the state, and a deduction for any gasoline reported which was not unloaded but exported without the state, and required the payment of 3 cents per gallon from the distributor on the balance of the gasoline so shown by the report to have been imported and unloaded and to be sold by the distributor within the state of Iowa. If gasoline was shipped in and not unloaded, it was not required to be included within the report.

4. At one time the oil company requested the treasurer of state to treat gasoline imported to Carter Lake as being in Nebraska and called it the Omaha bulk station, and they

were granted this permission and subsequent reports were made on that basis.

5. In the spring of 1932, the MonaMotor Oil Company imported into the state of Iowa, or shipped from Carter Lake, Iowa, to other points in Iowa about 40 cars of gasoline. These cars of gasoline were billed and shipped as gas oil and lubricating oil and these shipments were not reported to the state officers as gasoline imported and unloaded within the state at the times they were so shipped.

6. About April 8 or 9, 1932, the officers of the state and the officers of the MonaMotor Oil Company agreed to an audit of the books of the oil company by an independent auditing firm.

7. When this report was received by the state treasurer, he demanded of the oil company $24,959.10 as claimed fees for gasoline imported and unloaded and not theretofore reported to the state treasurer. The attorneys for the oil company later denied owing the fees demanded by the state treasurer.

8. On the 14th day of October, 1932, the state of Iowa and the state treasurer started an action in the state court to recover the fees theretofore demanded and accompanied the same by writs of attachment on the personal property of the oil company. This case was later transferred to the United States District Court, but was remanded on the motion of the plaintiff on the ground that it was an action by the state of Iowa.

9. On April 9, 1932, certain informations were filed before a justice of the peace in Pottawattamie county, Iowa, charging officers of the company with violations of the state law in filing false and incomplete reports and returns on gasoline.

10. In August, 1932, 10 indictments were returned by the grand jury of Pottawattamie county, Iowa, against certain officials of the MonaMotor Oil Company, charging them with violations of the state motor vehicle fuel tax law and upon these indictments pleas of guilty were entered by some of the officials, fines assessed, and the remaining indictments and charges thereunder dismissed.

11. On October 14, 1932, the state treasurer canceled the license which had been issued to the MonaMotor Oil Company as a distributor and in writing advised the company of his action. The license was canceled by the state treasurer upon the information contained in the Wolf & Co. audit. No notice of or hearing was held by the state treasurer of an intention to cancel the license.

12. The officers of the state of Iowa have no intention of further law actions or criminal actions against the MonaMotor Oil Company until the present litigation is terminated and the rights of the officers in the collection of the tax determined by the courts in the present proceedings.

13. The L. L. Coryell Oil Company has been engaged in blending or compounding certain gasoline in Iowa from naptha and they have failed or refused to pay certain taxes on gasoline they have blended out of naptha. Suit is now pending against the Coryell Company for the tax on that blended product and the state has through its officers insisted at all times that the naptha and blended gasoline are imported gasoline upon which a tax should be paid.

14. The complainant has collected taxes from consumers of gasoline under the motor vehicle fuel tax statutes of Iowa and retains the same.

15. Fact findings made by the court in the written opinion to which this order is attached may also be considered as fact findings herein.

### Conclusions of Law.

1. The court finds that neither the statutes under investigation nor the manner of their enforcement by the state officials impose any burden upon the interstate commerce engaged in by the plaintiff company.

2. That the provisions of the taxing statutes of the state of Iowa do not levy a tax upon the distributor of gasoline in the state of Iowa, but place upon such distributor the duty of collecting and paying the taxes assessed against the users of gasoline and permits him to recoup the taxes paid by a collection from the users of gasoline within the state.

3. That the method of imposing the gasoline tax by the statutes attacked does not discriminate in favor of the users of gasoline other than for its use for propelling motor vehicles upon the highways of the state, as the tax is an excise tax upon persons using the motor vehicle fuel in operation of motor vehicles upon the highways.

4. That the statute providing for the additional one cent levy is not unconstitutional as violating the Constitution of the state of Iowa.

5. That there is no discrimination as against any manufacturer in the state of Iowa, as no such manufacturer of gasoline existed at the time of the commencement of this action.

6. That there is no discrimination shown by the evidence in the manner of the enforcement of the statutes of the state as against distillers or blenders of gasoline within the state, nor do the statutes so discriminate.

7. That the action taken by the state officers in bringing criminal and civil suits and in canceling the license of the MonaMotor Oil Company was not done without justifiable reasons and cause shown.

8. That the criminal cases and the action of the treasurer in canceling the license of the complainant were all completed prior to the commencement of this suit and there is no threat at the present time of any further criminal proceedings or suits or procedure that would warrant the issuance of an injunction prohibiting the officers of the state from any such further proceedings.

9. That the action of the state treasurer in canceling the license of the MonaMotor Oil Company, although done without notice and a hearing thereon, was within the authority granted to him by the state statutes and was not done without due process of law.

10. That the suit is not against the sovereign state of Iowa, but against the officers of the state seeking to prevent the enforcement of the alleged unconstitutional statutes or of constitutional statutes in an unconstitutional manner.

11. That to grant the relief asked by the complainant in this case would interfere with the proceedings in the state court by injunction, prohibited by the Judicial Code.

12. As the complainant company has failed to offer or tender to pay back taxes collected by it under the statutes attacked, the complainant will not be allowed to retain its advantage or keep these taxes and then repudiate the act as unconstitutional.

Upon the findings of fact and conclusions of law above stated, it is hereby ordered that the petition of the complainant be and the same is hereby dismissed upon its merits and for lack of equity, with judgment against the complainant for costs. Complainant excepts.